In re NORTHVIEW CORPORATION; Calmark Motel Holding Corporation; and Calmark Hospitality Systems, Inc., Debtors.

GREYHOUND REAL ESTATE
FINANCE COMPANY,
Appellant,

v.

OFFICIAL UNSECURED CREDITORS'
COMMITTEE and Northview
Corporation, Appellees.

OFFICIAL UNSECURED CREDITORS'
COMMITTEE, Cross–Appellant,

v.

GREYHOUND REAL ESTATE
FINANCE COMPANY,
Cross–Appellee.

BAP No. CC–90–1729/1772–VJP.

Bankruptcy Nos. LA 90–05319 GM, LA 90–05232–GM and 90–05324–GM.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued March 20, 1991.

Submitted April 15, 1991.

Decided July 24, 1991.

Shelton L. Freeman, Phoenix, Ariz. and Harry D. Hochman, Los Angeles, Cal., for Greyhound Real Estate Finance Co.

Don Willenburg, Los Angeles, Cal., for Northview Corp.

Mary E. Itin, Los Angeles, Cal., for Official Unsecured Creditors' Committee.

Before VOLINN, JONES and PERRIS, Bankruptcy Judges.

## MEMORANDUM

### OVERVIEW

These are cross-appeals from an order holding that creditor Greyhound Real Estate Finance Company ("Greyhound") has a perfected security interest in pre-bankruptcy revenues generated by two of debtor's hotels, but that it has no security interest in the post-petition revenues. Greyhound appeals the order insofar as it deprives it of a security interest in the post-petition hotel revenues. The Official Unsecured Creditors' Committee ("the Committee") appeals that portion of the order which finds Greyhound to have a security interest in pre-petition hotel revenues.

### FACTUAL AND PROCEDURAL BACKGROUND

Debtor Northview Corporation ("Northview"), previously known as Vagabond Motor Hotels, owns or controls approximately 38 motels throughout the Southwest and West. On September 29, 1988, Northview assigned the leases to two of the hotels in Woodland Hills and Sacramento, California to a Northview subsidiary, Calmark Properties, Inc. ("Calmark"). On October 19, 1988, Greyhound entered into a $3.6 million loan agreement with Calmark. To secure the loan, Calmark executed in Greyhound's favor two leasehold deeds of trust (collectively referred to herein as "deed of trust") in the Woodland Hills and Sacramento leases.

The deeds of trust contained broadly worded security provisions which gave Greyhound security interests in both real and personal property owned by the trustor, Calmark. One of these provisions is found in the "Granting Clauses" and provides in relevant part as follows:

subject to the absolute assignment thereof to the Beneficiary pursuant to Article III hereof, the Lease, all income, rents, royalties, revenues, issues, profits, fees, and other proceeds of the Trust Property and all of Trustor's right, title, and interest of Trustor, now or hereafter acquired, as lessor or seller, as the case may be, in and to all leases, subleases, sales contracts, installment sales agree-

ments and purchase money notes pertaining to the Trust Property, or any part thereof, and all security documents related to any of the foregoing; ...

The agreement also contains a specific assignment of rents provision which states, *inter alia*, as follows:

Trustor hereby absolutely assigns and transfers to Beneficiary all the right, title and interest of Trustor in and to the lease and all existing and future lease agreements, subleases, occupancy agreements and use agreements relating to the Trust Property or any part thereof ... and all income, rents, royalties, revenues, issues, profits, fees, and other proceeds (including, without limitation, room sales) from the Trust Property....

Article 3.2 of the agreement, entitled "Security Agreement," states in pertinent part:

To the extent any of the Trust Property is property covered by the Uniform Commercial Code ("UCC Property"), this Deed of Trust constitutes a security agreement and Trustor hereby grants to Beneficiary, as secured party, a security interest in the Trust Property and the proceeds thereof in favor of Beneficiary for the purpose of securing Performance of the Obligations. This security interest shall be self-operative with respect to the UCC property, but the Trustor will execute and deliver on demand such security agreements, financing statements and other instruments as Beneficiary may reasonably request in order to impose and/or perfect the lien and security interest hereof more specifically upon any of the UCC Property.

Greyhound filed two identical UCC–1 Financing Statements (collectively referred to herein as "the financing statement") regarding its personal property interests in both hotels with the California Secretary of State. It also recorded its leasehold deeds of trust and assignments of rents with respect to both hotels. The financing statement covers, *inter alia*, the following collateral:

All income, rents, royalties, revenues, issues, profits, fees and other proceeds of the Property, including, without limitation, all of the right, title and interest of Debtor now or hereafter acquired, as lessor or seller, as the case may be, in and to all leases, sales contracts, installment sales agreements and purchases of money notes pertaining to the Property....

On March 1 or 2, 1990, Calmark reconveyed the two hotel leases back to Northview apparently out of a concern that the original conveyances might be deemed fraudulent conveyances. Greyhound contends that these reconveyances were made without its knowledge or consent.

Northview filed a Chapter 11[1] petition on March 6, 1990. Shortly thereafter, Greyhound filed a motion to condition the debtor's use of cash collateral based on its alleged security interest in the revenues generated by the Woodland Hills and Sacramento hotels. In a Memorandum of Opinion dated May 17, 1990, the bankruptcy court held that the hotel revenues are, under both California and Arizona law,[2] personal property and that any security interest in such property must be perfected by the filing of a financing statement. It further held that Greyhound had not filed its financing statement and therefore held an unperfected security interest.

Greyhound moved for reconsideration of the trial court's decision which was granted in part. In a Memorandum of Opinion dated July 24, 1990, the trial court determined that it had previously erred in finding that Greyhound had not filed a financing statement. As a result, it allowed Greyhound's security interest in all pre-petition hotel revenues. However, it held that Bankruptcy Code § 552 does not allow Greyhound to claim a security interest in the hotel ac-

---

**1.** Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 *U.S.C.* §§ 101–1330.

**2.** There was some question in the trial court as to whether California or Arizona law governed disputes between the parties. As to all issues on appeal, all parties have assumed that California law, and in particular the California Commercial Code, must be applied.

counts generated after the filing of the bankruptcy petition and disallowed a lien on such cash accounts arising post-petition.

Both Greyhound and the Committee filed notices of appeal in this case. Appellee Northview did not appeal the trial court's decision.

## ISSUES

The Committee's appeal raises the following issue: did the description of Greyhound's collateral in the security agreement create any security interest in the hotel revenues?

Greyhound's appeal raises a second issue: does Code § 552 prevent Greyhound from retaining its security interest in revenues generated after the filing of the bankruptcy petition? [3]

## STANDARD OF REVIEW

■ This case involves questions of law and fact. Legal issues are reviewed *de novo*, and factual findings are left undisturbed unless clearly erroneous. *Ragsdale v. Haller*, 780 F.2d 794, 795 (9th Cir.1986).

## DISCUSSION

A. Did Greyhound Obtain a Security Interest in the Hotel Revenues?

This question raises two sub-issues: (1) whether the deed of trust created any security interest in hotel revenues; and (2) whether Greyhound's financing statement was sufficient under the California Uniform Commercial Code Annotated ("Com-

mercial Code") to perfect such a security interest.

1. *The Creation of Greyhound's Security Interest* [4]

■ Commercial Code § 9203(1)(b) provides that one of the prerequisites for the creation of a valid security interest is "a security agreement which contains a description of the collateral." "The primary function of 9–203 is that of a statute of frauds; it is designed mainly to minimize disputes over whether there was an agreement and over what collateral it could have covered." *Northwest Acceptance Corp. v. Lynnwood Equipment, Inc.*, 841 F.2d 918, 921 (9th Cir.1988) (quoting J. White & R. Summers, *Uniform Commercial Code*, § 23–3, at 910 (2d Ed.1980)). A description of collateral, whether personal property or real estate, is sufficient if it "reasonably identifies what is described." Cal.Comm. Code § 9110 (Deering 1970).

The trial court held several hearings on the question of Greyhound's alleged security interest and struggled with the ambiguous language of the deed of trust. The trial court ultimately determined that Article 3.1(a) of the deed of trust, entitled "Assignment of Rents," created a security interest in hotel revenues. This section states in part that Calmark assigns and transfers to Greyhound "all income, rents, royalties, revenues, issues, profits, fees and other proceeds (including, without limitation, room sales)...." The trial court concluded that these words "can have no other meaning than the monies that are

---

**3.** Debtor Northview raises an additional issue. It argues that Greyhound has no security interest because Northview's original assignment of the leases to Calmark was void due to the parties' failure to comply with the perfection requirements in California Civil Code § 3440. Greyhound has moved to strike the portions of Northview's opening brief and appendix dealing with this issue on the grounds that Northview has no standing to dispute the validity of the security agreement since it has not appealed the trial court's decision. We grant Greyhound's motion to strike.

**4.** The weight of authority holds that hotel revenues are "accounts" (*i.e.*, personal property), rather than "rents" (*i.e.*, real property). *See e.g., In re Sacramento Mansion, Ltd.*, 117 B.R. 592

(Bankr.D.Colo.1990) (hotel revenues as accounts under California law); *In re M. Vickers, Ltd.*, 111 B.R. 332 (D.Colo.1990) (hotel revenues as accounts under Colorado law); *In re Investment Hotel Properties, Ltd.*, 109 B.R. 990 (Bankr. D.Colo.1990) (hotel revenues as accounts under Missouri law); *In re Kearney Hotel Partners*, 92 B.R. 95 (Bankr.S.D.N.Y.1988) (hotel revenues as accounts under Nebraska law); *In re Ashkenazy Enterprises, Inc.*, 94 B.R. 645 (Bankr.C.D.Cal. 1986) (hotel revenues as accounts under California law). *Contra In re Morningstar Ranch Resorts*, 64 B.R. 818 (Bankr.D.Colo.1986) (where the court assumed without discussing that hotel revenues are rents and subject to an assignment of rents provision).

collected by the hotel for use of its rooms." It relied in part on California Civil Code § 1644 (Deering 1971) which requires that the words of a contract "be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage...."

■ Under the Commercial Code, the test to determine whether particular collateral is subject to a security agreement is one of reasonableness and not whether a term of art is used. "No magic words or precise form are necessary to create or provide for a security interest so long as the minimum formal requirements of the [Commercial] Code are met." *In re Amex-Protein Dev. Corp.*, 504 F.2d 1056, 1058–59 (9th Cir.1974). In this case, the Assignment of Rents provision quoted above sufficiently describes hotel revenues. The words "income," "revenues," "fees," or "room sales" contained in this clause should be deemed the reasonable equivalents of "accounts." It is clear that the parties intended to create a security interest in "room sales" and other hotel revenues. The fact that they did not use the term "accounts" is not dispositive. This conclusion is bolstered by the use of most of these same words (*i.e.*, "income," "revenues," and "fees") in the Granting Clause.

Thus, we believe that Greyhound is entitled to a security interest in revenues generated by the Woodland Hills and Sacramento hotels.

### 2. *The Perfection of Greyhound's Security Interest*

■ The next question is whether the description in Greyhound's financing statement is adequate to perfect its security interest in the hotel revenues. The pertinent part of the financing statement tracks the language of the granting clause quoted above: "All income, rents, royalties, revenues, issues, profits, fees and other proceeds of the Property...." The Committee argues that the omission of the term "accounts" is a fatal flaw and is seriously misleading to third parties.

The Commercial Code provides that a financing statement is sufficient if it contains the names and addresses of the debtor and the secured party, is signed by the debtor, and "contains a statement indicating the types of collateral or describing the items of collateral." Cal.Comm.Code § 9402(1) (Deering 1970). "The statute mandates no particular language, nor does it insist on a strict format for compliance. 'A financing statement substantially complying with the requirements of [section 9402] is effective even though it contains minor errors which are not seriously misleading.' Cal.Comm.Code § 9402(8)." *In re Softalk Publishing Co., Inc.*, 856 F.2d 1328, 1330 (9th Cir.1988). *See also* Cal. Comm.Code § 9110 (Deering 1970) (requiring only reasonable identification of personal property in all matters covered by Article 9).

In *Softalk*, the Ninth Circuit explained that the description of collateral in a financing statement is often less specific than that contained in the security agreement. *Id.* at 1330. This situation derives from the different purposes of the two documents:

> The financing statement serves to give notice to other creditors or potential creditors that the filing creditor might have a security interest in certain assets of the named debtor. In contrast, the security agreement is a contract between a creditor and a debtor, pursuant to which the debtor encumbers its assets, granting a lien to the creditor in the specific items listed, upon the terms specified in the agreement.... A higher degree of specificity [in the security agreement] might be necessary to define the rights of the parties.... *The financing statement, on the other hand, serves merely to alert third parties to inquire further; it therefore need not offer exhaustive details.*

*Id.* at 1330 (emphasis added). *See also Biggins v. Southwest Bank*, 490 F.2d 1304, 1308 (9th Cir.1973) ("[T]he financing statement's purpose is ... never to provide a comprehensive data bank as to the details of prior security arrangements.").

In this case, the description contained in Greyhound's financing statement is almost identical to that provided by the security agreement. For the reasons stated above, the description of collateral is sufficient to create a lien. Accordingly, we hold that Greyhound's financing statement satisfies the Commercial Code's requirements.

**B. Does Bankruptcy Code § 552 Bar Greyhound from Retaining a Security Interest in Post–Petition Hotel Revenues?**

■ Bankruptcy Code § 552(a) provides that, except as limited by sub-section (b), "property acquired by the estate after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." Section 552(b) permits security agreements to remain effective as to after-acquired property which is "proceeds, product, offspring, rents, or profits" of prepetition collateral.

Section 552(b) is confusing and, understandably, the courts have struggled to define the types of after-acquired property which are includable in this provision. 4 *Collier on Bankruptcy* ¶ 552.01, 552–5 (15th Ed.1990). Greyhound argues that the hotel revenues are either proceeds, rents or profits, and therefore it retains its security interest in the hotels' post-petition accounts. The Committee contends that with each of the terms in § 552(b)—proceeds, product, offspring, rents and profits—the collateral is converted into new forms without the aid of new services or assets. It argues that since post-petition hotel revenues are derived from the delivery of post-petition goods and services, such "accounts" do not fall under the purview of any of these exceptions.

It appears that in sub-part (b) Congress intended to preserve the viability of security interests which attached to pre-petition collateral notwithstanding that the collateral might subsequently be converted into a different form. This intent is evidenced by the use of the terms "proceeds," "products," and "profits." For example, the legislative history indicates "[t]he term "pro-ceeds" is not limited to the technical definition of that term in the UCC [Uniform Commercial Code], but covers any property into which property is converted." H.R.Rep., No. 595, 95th Cong., 1st Sess. 377, 1978 U.S. CodeCong. & Admin.News 5787, 5963, 6333. However, the logical flow of the provision is interrupted by its use of the terms "rents" and "offspring," which refer to post-petition property that consists of more than the "conversion" by sale or disposition of pre-petition collateral. While these two terms are certainly related to and flow out of pre-petition collateral, both "rents" and "offspring" require the contribution of additional acts or services in order to come into being.

■ The only possible exceptions contained in § 552(b) that apply to the hotel revenues at issue in this case are "proceeds," "profits," or "rents." The revenues are not "proceeds," which refers to secured pre-petition personal property which is converted into some other property. *See In re S & J Holding Corp.*, 42 B.R. 249, 250 (Bankr.S.D.Fla.1984) (income generated from use of video machines is not proceeds under U.C.C. § 9–306(1)). Nor are the revenues "profits," which refers to sale of real property to which a security interest was attached and perfected before the bankruptcy filing. *See In re Investment Hotel Properties, Ltd.*, 109 B.R. 990, 996 (Bankr.D.Colo.1990) (distinguishing the use of the terms "proceeds" and "profits" as referring to conversions of personal property and real property, respectively). Finally, the revenues are closest in kind to "rents," since they are generated by the hotels' provision of room rentals and related services and do not arise from the mere conversion of pre-petition collateral. However, as discussed revenues must be deemed "accounts" and not "rents" in light of the case authority on this question.

Since none of the exceptions in § 552(b) apply to hotel revenues generated after the bankruptcy filing, the trial court's holding that Greyhound's security interest does not extend to the post-petition revenues was proper.

## CONCLUSION

The trial court correctly held that Greyhound has a security interest, and that it perfected that security interest, in hotel revenues. In addition, the trial court correctly found that Bankruptcy Code § 552(b) bars Greyhound's assertion of its security interest over hotel revenues generated after the filing of the bankruptcy petition. Accordingly, the trial court's decision is affirmed.