**EVERETT HOME TOWN LIMITED PARTNERSHIP.**

**Bankruptcy No. B–92–00889–TUC–RTB.**

United States Bankruptcy Court, D. Arizona.

Sept. 30, 1992.

C. Taylor Ashworth, Laurie B. Shough, Meyer, Hendricks, Victor, Osborn & Maledon, Phoenix, Ariz., for debtor.

Susan G. Boswell, Streich, Lang, P.A., Tucson, Ariz., for Members' Committee.

Mark A. Nadeau and Steven J. Brown, Morrison & Hecker, Edwin B. Stanley, McCabe, O'Donnell & Wright, Phoenix, Ariz., for Greyhound Real Estate Finance Co.

REDFIELD T. BAUM, Sr., Bankruptcy Judge.

This matter comes before the Court in connection with the Debtor's motion for authority to pay various operating expenses and the objection thereto by Greyhound Real Estate Finance Company (Gref-

co) claiming that such payments would be made with its cash collateral. The Unsecured Creditors' Committee has joined in this dispute which has essentially become focused upon the extent to which the funds of the Debtor are Grefco's cash collateral.

## I. FACTS

The Debtor is an Arizona limited partnership whose main asset is the Ventana Canyon Golf and Racquet Club (the "Club") in Tucson, Arizona. The Club is a first class golf and tennis club with two 18 hole golf courses, numerous tennis courts, 50 rental suites, a clubhouse and restaurants. Adjacent to the Club is the Loew's Ventana Canyon Resort Hotel (the "Resort") which, by contract with the Debtor, has the right to allow its occupants to have first priority to play one of the golf courses every day. Pursuant to that agreement, the Resort guarantees minimum annual revenue to the Debtor, primarily from green fees. If the minimum revenue is not paid by the Resort occupants, the Resort will pay the difference to the Debtor. To date, the revenue generated from Resort occupants has exceeded the minimum required and, accordingly, the Resort has never become obligated to make a payment to the Debtor pursuant to this commitment.

The Debtor operates, in part, as a private country club with approximately 800 members who have membership agreements with the Debtor. The membership agreements entitle the members to certain exclusive rights at the Club, primarily the right to have the exclusive use of one of the 18 hole golf courses. Further, the members are required to spend minimum annual amounts at the Club.

The Debtor is not a totally private club because tee times are available to the public daily on one of the 18 hole golf courses. Although the record is less than clear in this regard, the public's use of one of the golf courses appears to be on an "as available basis," i.e., it appears that as the tee times are available because they are not being used by the members or Resort occupants they can be used by the public. Further, the 50 suites are available to the public and as used the occupants have the use of the Club.

Grefco lent the Debtor $20,000,000.00. The agreement between the Debtor and Grefco authorized negative amortization resulting in Grefco claiming that it was owed a principal debt of approximately $25,600,-000.00 on the date the petition was filed. This debt was secured by a first deed of trust on the real property, an assignment of the rents, issues and profits from the real property, a security interest in all personal property used at the Club together with the membership agreements and the above described agreement between the Resort and the Debtor and a reserve account maintained at a designated bank. For purposes of this ruling it is significant to note that the security interest granted covered "all income, rents, royalties, revenues, issues, profits, fees and other proceeds of the Real Property, including, without limitation, all of the right, title and interest of the Debtor, now or hereafter acquired, and as tenant or landlord or seller, in and to all leases, occupancy agreements and use agreements (whether written or oral and whether for a definite term or month to month)".

In September 1991, the Debtor amended its certificate of limited partnership filed with the Arizona Secretary of State to change its name to Everett Hometown Limited Partnership from Ventana Canyon Limited Partnership. This case was filed in March 1992.

Generally, the revenue earned by the Debtor can be categorized as follows: (1) green fees and golf cart fees paid by members of the Club, occupants of the Resort and the public, (2) charges for the use of the 50 suites, (3) charges at the restaurants by such members, occupants and public, (4) general pro shop charges such as lessons, equipment rental, bag storage, range balls and the like, (5) tennis fees and (6) members fees, dues and minimum spending obligations.

## II. STATEMENT OF THE LAW AND ANALYSIS

### A. *Post Petition Revenues of the Debtor*

Most of the revenues in dispute between these parties involve the post petition reve-

nues of the Debtor. Section 552 of the Code provides the extent to which pre-petition security interests will extend to property acquired post petition.

Section 552(a) of the Code states the general rule that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case," except as provided in Section 552(b). Section 552(b) of the Code allows a pre-petition security interest in "property of the debtor acquired before the commencement of the case" and "to proceeds, product, offspring, rents or profits of such property acquired by the estate after the commencement of the case" to remain effective notwithstanding the bankruptcy if *all* of the requirements of that section are met. Section 552(b) provides a narrow exception to the general rule of Section 552(a) that pre-petition security interests do not extend to property acquired by the estate after the filing of the petition. *In re Bering Trader, Inc.,* 944 F.2d 500 (9th Cir.1991).

Section 552(b) has been called "confusing" and the courts, as this Court did in this case, have struggled to define the types of after-acquired property which are included within its provisions. *In re Northview,* 130 B.R. 543 (9th Cir.B.A.P. 1991); 4 *Collier on Bankruptcy,* 552.01, 552–5 (15th Ed.1990).

### 1. Revenues Other Than Suite Or Membership/Resort Occupant Revenues

■ Certain revenues at the Club, namely green fees, cart fees, restaurant revenue, tennis fees and pro shop revenue, appear to not fit within any of the Section 552(b) exceptions. Green fees and cart fees have been determined to not be within the Section 552(b) exceptions. *In re GGVXX,* 130 B.R. 322 (Bankr.Colo.1991). This is the only case cited to the Court by the parties or which the Court has been otherwise able to locate on this type of revenue. *In re Zeeway Corp.,* 71 B.R. 210 (9th Cir.B.A.P.1987) commented that income from a restaurant or retail store

would not be cash collateral under the provisions of Section 363 referring to proceeds, products, offspring, rents or profits, the identical language from Section 552(b), because such revenue although produced by the use of the real property upon which the business is conducted, the income is not proceeds of the property but the result of the services provided by the business.

This Court finds and concludes that this type of revenue does not constitute proceeds, products, offspring, rents or profits and agrees with the analysis and conclusions of *GGVXX* and *Zeeway.* Therefore, because under Section 552(a) any interest of GREFCO in these revenues terminates upon the filing of the case, GREFCO has no cash collateral rights therein.

### 2. Suite Revenues/Rents

■ The suite revenues are essentially the same as the revenues earned by hotels. Many cases have held that a security interest in hotel revenues does not continue post petition under Section 552 of the Code. *In re Northview, supra;* See also: *In re Kearney Hotel Partners,* 92 B.R. 95 (Bankr.S.D.N.Y.1988); *In re Greater Atlantic and Pacific Investment Group, Inc.,* 88 B.R. 356 (Bankr.N.D.Okla.1988); *In re Majestic Motel Associates,* 131 B.R. 523 (Bankr.Me.1991); *In re M. Vickers Limited,* 111 B.R. 332 (Bankr.D.Colo.1990); *In re Sacramento Mansion Limited,* 117 B.R. 592 (Bankr.D.Colo.1990); *In re Investment Hotel Properties Limited,* 109 B.R. 990 (Bankr.D.Colo.1990); *In re Corpus Christie Hotel Partners, Ltd.,* 133 B.R. 850 (Bankr.S.D.Tex.1991); *In re Tri-Growth Centre City Ltd.,* 133 B.R. 524 (Bankr.S.D.Cal.1991); *In re Airport Inn Associates, Ltd.,* 132 B.R. 951 (Bankr. D.Colo.1990); *In re Ashoka Enterprises, Inc.,* 125 B.R. 845 (Bankr.S.D.Fla.1990); *In re Shore Haven Motor Inn, Inc.,* 124 B.R. 617 (Bankr.S.D.Fla.1991); *In re Oceanview/Virginia Beach Real Estate Associates,* 116 B.R. 57 (Bankr.E.D.Va.1990); and *In re Ashkenazy Enterprises, Inc.,* 94 B.R. 645 (Bankr.C.D.Cal.1986). *Contra In re Morningstar Ranch Resorts,* 64 B.R. 818 (Bankr.D.Colo.1986),

Subsequent to the *Northview* case, a distinguished bankruptcy judge in the 9th Circuit reached a contrary conclusion. See: *In re S.F. Drake Hotel Associates*, 131 B.R. 156 (Bk.N.D.Cal.1991). *Northview*, relying mainly upon earlier cases, concluded that hotel revenues were accounts under the Arizona Uniform Commercial Code (AUCC) and that accounts did not fall within any of the exceptions of Section 552(b) of the Code which allow certain security interests to continue post petition.

■ However, hotel revenues are not accounts as that term is defined in the AUCC. This conclusion is established from various provisions of the AUCC. ARS 47–9106 defines account to mean "any right to payment for *goods* sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance" (emphasis added). ARS 47–9105(A)(10) defines goods as "includes all things which are movable at the time the security interest attaches or which are fixtures, but does not include *money*, documents, *instruments*, accounts, chattel paper, general intangibles, or minerals or the like (including oil and gas) before extraction" (emphasis added). ARS 47–9109 categorizes goods as either consumer goods, equipment, inventory or farm products, significantly all categories of goods are personal and not real property. Any possible doubt that goods must be personal and not real property is established by ARS 47–9104(10) which provides that Article 9 of the AUCC does not apply to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder. Although no evidence has been presented on this issue, it presumably is not disputed that hotel revenues are received in the form of either cash (money), credit card receipts (probably most of the revenues are such receipts) or, in a few instances, as an account receivable. These revenues do not fall within the definition of accounts in the AUCC. First, regardless of the method of payment, the payment is not for *goods* as that term is defined in the AUCC. The payment is for the occupancy of the suite. Second, cash/money is excluded from the definition of goods in the AUCC and thus would also not fit within the definition of accounts in the AUCC. Thus, cash payments for the use of the suites would not be an account. Third, based upon ARS 47–9105(A)(11), which defines instrument to mean "a negotiable instrument (defined in ARS 47–3104), or a security (defined in ARS 47–8102) or *any other writing which evidences a right to payment of money* and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment" (emphasis added), credit card receipts are instruments under the AUCC. Because accounts and goods do not include instruments, suite revenues paid by credit card are neither accounts nor goods. Therefore, regardless of the form of the suite revenue, such revenue is not an "account" under the AUCC.

■ If hotel revenues are not accounts, are they rents, as *S.F. Drake* concluded? This Court, in general, agrees with the reasoning of *S.F. Drake*, particularly that the intent of the parties was to grant a security interest in this revenue. To the extent that the occupant of a hotel pays for services, such payments are accounts under the AUCC. But the main charge is for the occupancy of the property and these other charges are incidental to both the occupancy and the charge therefore. In any event such accounts for services rendered can be segregated as the cash collateral of the lenders, like Grefco. Further, those courts that concluded that hotel revenues are not rents but accounts because of the legal distinction between a lease and a license may have taken too narrow a view of the term "rent" as used in Section 552(b). *Webster's Ninth New Collegiate Dictionary* (1988) defines rent to mean "a usually fixed periodical return made by a tenant or *occupant* of property to the owner for the possession and use thereof" (emphasis added). Section 552 applies to all security interests and thus covers a wide range of property and, therefore, it is probably appropriate to define its terms in their general sense and not by the definitions used in other statutes in the various states. The plain language of the Bankruptcy Code

is controlling. *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Toibb v. Radloff*, — U.S. —, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). The plain meaning of rents in Section 552(b) *would* include payments from hotel/suite occupants who *would not* constitute "tenants" as that term is defined by various state statutes.

For the reasons set forth above, this Court concludes that hotel revenues are rents, as that term is used in Section. 552.

### 3. Membership and Resort Occupant Revenues

■ Grefco, citing *United Virginia Bank v. Slab Fork Coal Co.*, 784 F.2d 1188 (4th Cir.1986) and *In re Sunberg*, 729 F.2d 561 (8th Cir.1984), claims that all payments by members are proceeds under the membership agreements and, thus, covered by Grefco's security interest in the membership agreements. Further, Grefco argues such payments, as proceeds, fit within the Section 552(b) exception, allowing Grefco's security interest to continue in such payments notwithstanding the bankruptcy filing by the Debtor. Thus, Grefco claims that such funds are cash collateral under Section 363.

Based upon the holdings in *Slab Fork* and *Sunberg*, it appears to this Court that Grefco is correct regarding the membership fees and dues and that such payments are proceeds of the membership agreements in which Grefco holds a perfected security interest. Thus, any membership fees or dues held by or hereafter received by the Debtor would be Grefco's cash collateral under Section 363. Neither the Debtor or the Committee appear to strenuously challenge this view.

■ The more difficult issue is the other payments by the members for green fees, cart fees, food and similar payments. Such payments are paid by the members, in part, pursuant to their membership agreements granting them the right to use various facilities of the Debtor. However, such use in many ways is identical to the use of the facilities by the general public and other nonmembers. Payments for green fees, tennis fees, cart fees, meals, lessons and merchandise are as much (in some situations more) for the use, service or merchandise provided by the Debtor as they are pursuant to the membership agreement. Although it is a fine line to draw, because these payments are more for the use, service or merchandise provided and less made pursuant to the membership agreements, such payments are *not* proceeds of the membership agreement and, as required by Section 552, Grefco does not have any interest in such post petition payments.

■ Considering whether payments made by Resort occupants for the use of the Club constitute proceeds under Section 552(b), the Court concludes that such payments are not proceeds. Although Grefco holds a security interest in the agreement between the Resort and the Debtor together with the proceeds thereof, such payments are not made by the Resort to the Debtor. Rather the payments come from the Resort occupants to the Debtor for the use of the Club. In fact, the Resort occupants are probably unaware of the existence of that agreement. Therefore, the payments are not proceeds of the agreement between the Resort and the Debtor.

### 4. The Equities Of The Case Exception Under Section 552(b)

None of the parties addressed the "equities of the case" exception in Section 552(b). The exception to the general rule of Section 552(a), contained in Section 552(b), has its own "exception to the exception" which provides that the court may, based upon the equities of the case, not allow a post petition security interest authorized under Section 552(b), to continue if that would be inequitable. It is interesting to note that the case relied upon by Grefco, *Slab Fork*, relying upon this provision of Section 552(b), after noting that this provision gave the bankruptcy court considerable latitude in establishing the appropriate balance between the rights of secured creditors and the rehabilitative purposes of the Bankruptcy Code, remanded the case to the bankruptcy court, in part, to consider the equities of the case vis-a-vis the claims to the funds asserted by the debtor and secured creditor.

Because this aspect of Section 552(b) has not been addressed by the parties, the

Court will reserve consideration of the "equities of the case" issue under Section 552(b) pending briefing by the parties. Therefore, the decision rendered herein is subject to the resolution of this issue by the Court.

### B. *Pre-petition Revenues of the Debtor*

█ Section 363 of the Code provides that cash collateral includes cash and cash equivalents in which the debtor and another entity have an interest. Under the facts of this case, Grefco's interest in the various cash and cash equivalents of the Debtor would be determined by ARS 47–9306(D)[1]. This statute, according to the Official Comments to the Uniform Commercial Code Section 9–306, provides specific rules of identification of proceeds for insolvency proceedings. To the extent that the pre-petition revenues of the Debtor can be identified in accordance with the requirements of ARS 47–9306(D), such identifiable proceeds would be Grefco's cash collateral and, therefore, can only be used by the Debtor in accordance with requirements of Section 363.

## III. THE ALLEGED FRAUDULENT CHANGE OF NAME ISSUE

It is undisputed that more than four months prior to filing this proceeding, the Debtor filed the requisite paper work to change its name. ARS 47–9402(A) provides that where the debtor so changes its name that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new, appropriate financing statement is filed before the expiration of that time. Based upon this statute, the Debtor asserts that GREFCO does not hold a perfected security interest in what GREFCO claims is its cash collateral.

GREFCO responds to this claim of the Debtor by asserting that the Debtor's action in this regard were fraudulently done for the express purpose of depriving GREFCO of its security interests.

More specifically, part of the record before this Court is the complaint of Grefco filed in the state court against various individuals or entities affiliated with or related to the Debtor, wherein Grefco alleges that the Debtor's name change was done fraudulently, in violation of the Debtor's contractual duty of disclosure to Grefco, that the name change was intentionally concealed from Grefco until its filed financing statement had expired and that such actions were part of an intended course of action designed to deprive Grefco of its security interest granted by the Debtor.[2] GREFCO also asserts that the Debtor did not truly change its name because it continued to operate and use its former name after filing its change of name. The Debtor has filed an adversary proceeding against Grefco to determine the validity, priority and

---

1. ARS 47–9306(D) provides:

D. In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a security interest only in the following proceeds:

1. In identifiable non-cash proceeds and in separate deposit accounts containing only proceeds;

2. In identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency;

3. In identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings; and

4. In all cash and deposit accounts of the debtor, in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph 4 is:

(a) Subject to any right of set-off; and

(b) Limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days before the institution of the insolvency proceedings less the sum of:

(i) The payments to the secured party on account of cash proceeds received by the debtor during such period and

(ii) The cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs 1 through 3 of this subsection.

2. Grefco has filed a 97 page complaint in the state court alleging various claims against affiliates and related parties to the Debtor and/or the individual principals therein, including claims that the actions of the defendants constituted racketeering in violation of the Arizona law, seeking treble damages in the amount of

**460**

extent of the lien of Grefco, which includes the claim the Grefco's lien has expired because of the change of the Debtor's name and that no financing statement was filed within the four month period allowed by statute.

This Court has not been cited to and has not on its own been able to locate any case authority that deals with the issue of a debtor's name being changed for the express purpose of depriving a secured creditor of it collateral. Assuming that in fact this Debtor did change its name with the purpose of depriving GREFCO of its security interests, such action may be fraudulent and might be wrongful.

ARS 47–1203 provides that "Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." If the Debtor changed its name for the express purpose of depriving GREFCO of its security interest, the Debtor may, at a minimum, have violated its obligation of good faith in its performance and/or enforcement of its rights under its contract with Grefco. Further, every petition before this Court must be filed in good faith. *In re Thirtieth Place, Inc.*, 30 B.R. 503 (9th Cir.BAP 1983). At this time, this Court does not need to decide whether these good faith obligations are identical, i.e., does the violation of the good faith obligation under the AUCC mean that the petition was filed in bad faith or are these good faith obligation independent of each other.

The resolution of this name change issue and the effect thereof will depend upon various factual issues which at this time are unresolved. The burden in this regard appears to be on GREFCO because the Debtor did file the appropriate documents for a change of name which on its face would appear to make the prior financing statement seriously misleading and, therefore, pursuant to ARS 47–9402 such financing statement would not be effective four months after the change of name. If Grefco can prove its claim, this Court may have to fashion an appropriate remedy for such wrong since it appears this is an uncharted area of the law. However, that determina-

$79,500,000.00, punitive damages of at least

tion can be deferred pending further proceedings on this claim.

In conclusion, the Court cannot resolve this claim based only upon the memorandums of the parties and, therefore, this claim must abide further proceedings, presumably including an evidentiary hearing before this Court on this claim.

## IV. CONCLUSION

For the reasons set forth above, the Court concludes that the suite revenues and rents, membership fees and dues, and those pre-petition revenues identifiable under the provisions of ARS 47–9306(D) of the Debtor are the cash collateral of Grefco. The balance of the Debtor's revenues, such as green fees, cart fees, restaurant and the other revenue are not cash collateral of Grefco because Grefco's rights and interest therein is terminated upon the filing of the petition pursuant to Section 552 of the Code.

Further, no decision is made at this time regarding the "equities of the case" exception stated in Section 552(b) or the alleged fraudulent name change claim by Grefco. Those issues will require further proceedings before the Court.

$100,000,000.00 and other relief.