In re The GREEN CORPORATION,
Debtor.

CASCO NORTHERN BANK,
N.A., Movant,

v.

The GREEN CORPORATION,
Respondent.

Bankruptcy No. 92–10903.

United States Bankruptcy Court,
D. Maine.

May 18, 1993.

Thomas M. Brown, Eaton, Peabody, Bradford & Veague, Bangor, ME, for debtor/respondent.

George J. Marcus, Pierce, Atwood, Scribner, et al., Portland, ME, for Casco Northern Bank/movant.

## MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

### INTRODUCTION

A bankruptcy court in this district recently held that motel room revenues were not "rents" within the meaning of Bank-

ruptcy Code § 552(b)[1] and assignment of rent clauses executed in favor of a secured lender by four Chapter 11 debtors. *In re Majestic Motel Assoc.*, 131 B.R. 523 (Bankr.D.Me.1991). Holding reservations about *Majestic Motel*'s rule, and having failed to reach an accommodation with the debtor in this case, Casco Northern Bank, N.A. ("Casco"), has moved to limit the Green Corporation's unconditioned, postpetition use of room receipts from motel operations.

Casco's motion asks this court to hold that motel room receipts constitute "proceeds, product, offspring, rents, or profits" under § 552(b); are within the scope of the debtor's assignment of leases and rents to it; are "cash collateral" under § 363(a); and, therefore, are subject to the cash collateral use restrictions of § 363(c)(2). I conclude, however, that *Majestic Motel* is good law, that its rule applies here, and that Casco's motion must be denied.[2]

1. All references to statutory sections are to the Bankruptcy Reform Act of 1978 (the "Bankruptcy Code" or the "Code"), as amended, 11 U.S.C. § 101, *et seq.*

2. The facts are not in dispute. This memorandum recites the material facts and sets forth the court's conclusions of law in accordance with Fed.R.Bankr.P. 7052.

3. That Casco's liens on the debtor's real estate and personal property are properly perfected under Maine law is not disputed.

4. The 1988 loan may be secured by the 1987 mortgage and security agreement under the "future advances" clause of the 1987 loan documents. It is secured by a separate security agreement executed at the 1988 closing. *See* Casco Northern Bank's Motion for Order Limiting Use of Cash Collateral dated April 2, 1993, at ¶ 6. The debtor disputes its liability on the 1988 loan, contending that it is the obligation only of its principals, Lawrence and Donna Green, and that it is not secured by corporate assets. *See* Complaint to Determine Nature, Extent and Priority of Liens, ¶ 12, *The Green Corporation v. Casco Northern Bank, N.A.*, Adv.Proc. No. 93-1042. In light of the undisputed, secured corporate obligation on the 1987 loan, resolution of those disputed issues is unnecessary in connection with the pending cash collateral motion.

5. The debtor conveyed a mortgage in
certain real estate with all the buildings and improvements thereon, situated at and near, Millinocket, Penobscot County, Maine ... and

FACTS

The Green Corporation filed its voluntary Chapter 11 petition on December 21, 1992. Its assets include a motel, including a restaurant and bar, known as The Heritage Motor Inn (the "Heritage"), in Millinocket, Maine. The debtor also owns an adjacent building, leased to a commercial tenant, unrelated to the motel operation.

Casco was the debtor's principal prepetition lender. On June 15, 1987, it loaned the debtor $1,300,000.00. The 1987 loan is secured by real and personal assets associated with the Heritage under a loan agreement, a mortgage and security agreement, each dated June 15, 1987.[3] On September 15, 1988, Casco advanced an additional $350,000.00.[4]

In addition to conveying a mortgage on the debtor's Millinocket real estate[5] and granting a lien on substantially all of the debtor's personal property at the Heritage,[6] the 1987 mortgage conveys and as-

all other tangible personal property intended for use in construction of buildings and other improvements on said premises, now and hereafter owned by the Grantor and now affixed and to be affixed or now and hereafter located upon said land.

Mortgage and Security Agreement dated June 15, 1987, Ex. A to Objection to Casco Northern Bank's Motion for Order Limiting Use of Cash Collateral, at 1.

6. Also conveying and granting hereby as part of the realty and as property mortgaged hereunder, all of the following articles now and hereafter on the above-described premises or used or intended to be used in connection therewith. All plumbing, heating, lighting ... and furnishings, fixtures and articles of personal property now and hereafter owned by Grantor and now and hereafter affixed to, placed upon or used in connection with the operation of said premises for business and commercial purposes, and all other purposes whether or not included in the foregoing enumeration, together with cash proceeds and non-cash proceeds of all of the foregoing ... but excepting inventory and personal property to be consumed or sold in the normal course of business of Grantor.

*Id.* The debtor also granted the bank a security interest in inventory, accounts receivable and equipment. Loan & Security Agreement dated June 15, 1987, Ex. B to Objection to Casco Northern Bank's Motion for Order Limiting Use of Cash Collateral, at §§ 1.1, 1.2 and 1.3.

signs certain revenues to Casco to secure repayment:

As further security for payment of the indebtedness and performance of the obligations, covenants and agreements secured hereby, Grantor hereby transfers, sets over and assigns to Grantee:

A. All rents, profits, revenues, royalties, bonuses, rights and benefits under any and all leases or tenancies now existing or hereafter created of the premises or any part thereof, and all rights against guarantors of any leases with the right to receive and apply the same to said indebtedness, and Grantee may demand, sue for and recover such payments, but shall not be required to do so; provided, however, that so long as grantor is not in default hereunder, the right to receive and retain such rents, issues and profits is reserved to Grantor. To carry out the foregoing, Grantor agrees (1) to execute and deliver to Grantee such conditional assignments of leases and rents applicable to the mortgaged premises as the Grantee may from time to time request, while this mortgage and the debt secured hereby are outstanding, and further (2) not to cancel, accept a surrender of, reduce the rentals under, anticipate any rentals under, or modify any such leases or tenancies or consent to an assignment or subletting thereof, in whole or in part, without Grantee's written consent. Nothing herein shall obligate the Grantee to perform the duties of the Grantor as landlord or lessor under any such leases or tenancies, which duties Grantor hereby covenants and agrees to well and punctually perform.

*Id.* at 2.

The debtor has accumulated substantial funds from its postpetition motel operations after paying ordinary expenses. Although it agrees with Casco that the bank has valid, perfected liens on all of the debtor's prepetition assets, it asserts that Casco's liens do not continue in motel revenues generated postpetition.[7]

## DISCUSSION

1. *Section 552 and Rents: Identifying the Issue.*

■ Section 552(a) establishes the general rule that prepetition security interests, even "floating" liens and liens with "after acquired property" provisions, do not extend to property acquired by the debtor after the bankruptcy filing. Sec. 552(b) provides a limited exception to the general rule for "proceeds, product, offspring, rent or profits" of encumbered property.[8] *See In re Cross Baking Co., Inc.,* 818 F.2d 1027, 1029–30 (1st Cir.1987).

Section 552(b) expressly directs that the extent to which the security interest reaches such property is governed by the security agreement's terms and applicable nonbankruptcy law, in this case the law of Maine. *Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.),* 944 F.2d 500, 502 (9th Cir.1991) (applying Washington law); *Unsecured Credi-*

---

**7.** The debtor concedes that it has assigned Casco rents under the lease of the commercial building adjacent to its motel and does not dispute the bank's § 552(b) postpetition lien on those rents or their character as cash collateral. *See, e.g., In re Somero,* 122 B.R. 634 (Bankr.D.Me. 1991). The debtor has segregated those rents, accounted for them, and has made payments to the bank in respect of them.

**8.** Sec. 552, entitled "Postpetition effect of security interest," states:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

*tors Comm. v. Marepcon Fin. Corp. (In re Bumper Sales, Inc.),* 907 F.2d 1430, 1437 (4th Cir.1990) (collecting cases). *See* 4 Lawrence P. King, *Collier on Bankruptcy* ¶ 552.02 at 552–8 (1993). *See generally Butner v. United States,* 440 U.S. 48, 56, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) (property rights of debtor and creditors are defined by pertinent state law).[9]

Under § 363(*o*)(2), the burden is on Casco, as the party asserting that its lien survives the petition, to prove that it is so.[10]

The "security agreement" in question is the assignment of rents provision within the mortgage granted Casco by the debtor. Thus, the issue is, assuming that they are within the contractual assignment,[11] whether motel room revenues constitute "proceeds, product, offspring, rents or profits of" the debtor's Millinocket real estate under Maine law.

### 2. *The Majestic Motel Holding.*

In *Majestic Motel,* Judge Goodman considered assignment of rent clauses in mortgages granted to the secured lender by three debtors that operated motels and one that ran a seasonal campground. 131 B.R. at 524–25. There was no dispute that the bank held a valid, perfected interest in "rents and profits" from the debtors' real estate. *Id.* at 525. Looking to state law, the court concluded that motel room revenues and receipts from transient campers for temporary campsite use were not "rents" or "profits" under Maine law. *Id.* "Rent," it concluded means "payments on behalf of a tenant for his interest in real estate." *Id.* Focusing on the language of § 552(b), *Majestic Motel* distinguished between revenues generated by the underlying real estate (*e.g.,* "rents and profits") and those that flow from the operation of a business on the property. *Id.* at 526. It observed that, taken together, "rents and

profits" does not include "business profits arising out of the operation of the mortgaged premises not rented to others but occupied and used by the mortgagor." *Id.* (quoting *Detroit Trust Co. v. Detroit City Serv. Co.,* 262 Mich. 14, 42–43, 247 N.W. 76 (1933)).

### 3. *Casco's Contentions:*

Casco urges this court to look to the "economic reality" of its relation to the debtor and to the intent of the parties in negotiating a comprehensive security interest in all motel assets, real and personal. It contends that doing so will betray the unsoundness of *Majestic Motel's* rule and lead to a contrary conclusion. The bank suggests that *Majestic Motel* need not be repudiated but, rather, that there is room to "refine" its rule to take into account the fact that motel room revenues are composed in substantial part of charges derivative of the use of real property so as to constitute, in some portion, "rents." It cites two recent cases, neither of which was available when *Majestic Motel* was decided, in support of its position.

In *In re S.F. Drake Hotel Assoc.,* 131 B.R. 156 (Bankr.N.D.Cal.1991), *aff'd* 147 B.R. 538 (N.D.Cal.1992), the bankruptcy court held that the lender held a continuing, postpetition security interest in revenues from hotel operations. The crux of its holding was the court's view that, at bottom, hotel room revenues are predominantly a function of the provision of shelter on, or in, the debtor's real property. Thus, the substantial services a hotel provides are, in essence, adjunctive:

> Any services that a hotel provides are incidental to room occupancy. The hotel guest's primary objective is shelter. That shelter is provided by the land and improvements of the hotel. A hotelier cannot operate a hotel without the real

---

**9.** *Butner* addressed issues arising under the Bankruptcy Act of 1898. Its teaching remains valid under the Code. *See Barnhill v. Johnson,* 503 U.S. ——, ——, 112 S.Ct. 1386, 1390, 118 L.Ed.2d 39 (1992); *In re Public Service Co. of N.H.,* 884 F.2d 11, 14 (1st Cir.1989); *In re Cormier,* 147 B.R. 285, 289 n. 18 (Bankr.D.Me.1992).

**10.** Sec. 363(*o*)(2) provides that in a hearing determining the nature or use of purported cash collateral, "the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest."

**11.** *See infra* n. 18.

property and improvements, no matter what the extent of the services provided. 131 B.R. at 159. The court accepted the "logical appeal" of the propositions that revenue generated from any occupancy of real property for "residential" use is rent and that the character of the revenue should not be determined by the length of the tenant's stay or by the level of incidental services provided. *Id.* at 160.

The *S.F. Drake* court found no reason why hotel room revenues should be viewed as "accounts," declaring that "the conclusion that room revenue is not rent generated by real property is counterintuitive." *Id.* It stated that "the common understanding of rent as compensation for use of property," taken together with the "knowledge that a lodger primarily seeks shelter, not service" leads to the conclusion that room revenue is "rent" in the real property law sense. *Id.* at 160–61. Finally, the court observed that the parties intended that the lender be given a lien on virtually all of the debtor's assets, including revenue from the hotel, and defined "rents" broadly in the security documents to encompass "all economic benefits" from the use or occupancy of the hotel. "With the intent of the parties so clearly stated, no reason exists to use the term 'account' to defeat their intent." *Id.*

Casco also relies on *In re Miami Center Assoc., Ltd.*, 144 B.R. 937 (Bankr.S.D.Fla. 1992). Acknowledging that most courts have held that hotel revenues are not rent, the *Miami Center* court considered that they may, nevertheless, be "proceeds" or "profit."

> Given the unique nature of hotel financing, the fact that the bulk of hotel revenue is generated from the use of rooms (as opposed to services), and the fact that the clear intent between [the lender] and the debtor under the loan documents was to subject revenue derived from the physical use of the Hotel to a lien in favor of [the lender], the better view is that § 552(b) extends [the lender]'s prepetition lien to post-petition hotel reve-

nue. *See, e.g., In re Mid–City Hotel Associates*, 114 B.R. 634 (Bankr.D.Minn. 1990) (although room revenue classified [sic] as rents, revenue from room rates constituted "profit" and therefore fell under § 552(b) exception.)

144 B.R. at 941.[12]

Relying on these authorities, Casco asserts that Green Corporation's revenues from the Millinocket motel are rents for purposes of the § 552(b) exception. If they are not rents, it continues, they are something else (e.g., "proceeds," "products" or "profits") that brings it within § 552(b).

4. *Analysis.*

    a. "Rents and Profits."

        i. "Rents."

■ There exists no express Maine authority, statutory or decisional, directly on point. I must therefore determine the law that Maine courts would apply if faced with the issue. *People's Heritage Sav. Bank v. Recoll Management, Inc.*, 814 F.Supp. 159, 166 (D.Me.1993).

Maine authorities link "rent" to tenancy. "Rent is a sum stipulated to be paid for the actual use and enjoyment of another's land." *Cooper v. Casco Mercantile Trust Co.*, 134 Me. 372, 378, 186 A. 885 (1936), *quoted in Majestic Motel*, 131 B.R. at 525. *Cf. Trimount Coin Machine Co. v. Johnson*, 152 Me. 109, 113, 124 A.2d 753 (1956) ("To lease property in ordinary meaning is to obtain the use and possession of the property *in return for rent*") (discussing personal property leases) (emphasis added); *Opinion of the Justices*, 146 Me. 183, 189, 79 A.2d 753 (1951) ("rent is payment for the use of property") (reviewing purported lease of real estate in light of state government borrowing limits). *See generally* 49 Am.Jur.2d, *Landlord and Tenant* § 513 (1970) ("Rent is a normal incident of the relationship between landlord and tenant....")

■ The landlord/tenant relationship comprehends a transfer of rights, including the right to possession, in space that is

---

12. *Miami Center* does not expressly conclude that hotel room revenues are "profits," but its citation to *Mid–City* makes the conclusion implicit.

intended to have a fixed location for the duration of the lease. *See Restatement (Second) of Property* § 1.1 (1977). The relationship may endure for any fixed or computable period of time. *Id.* at § 1.4. "To be a tenant a person must have some estate, be it ever so little, such as that of tenant at will or on sufferance. A person in occupation of real estate as a servant or licensee is not a tenant." *City of Waterville v. Kelleher,* 127 Me. 32, 35, 141 A. 70 (1928). *See also Bowley v. Fuller,* 121 Me. 22, 26, 115 A. 466 (1921) ("[T]here was no tenancy, not even a tenancy at will, because tenancy implies an estate in the real property for the time being, an ownership *pro hac vice.*")

■ An hotel or motel guest acquires no such estate. *See Restatement (Second) of Property* § 1.1 cmt. c (arrangements for use of fixed location but not giving rise to landlord/tenant relationship); § 1.2 cmt. a, illus. 1, 2. Hotel guests are licensees, holding a revocable right to use the premises, subject to the owner's retained control and possession. *Sawyer v. Congress Square Hotel Co.,* 157 Me. 111, 114–15, 170 A.2d 645 (1961). *See In re Nendels–Medford Joint Venture,* 127 B.R. 658, 663 (Bankr. D.Or.1991). *See generally* Richard J. Powell, 3 *Powell on Real Property* ¶ 428 at 34–314 ("The ephemeral character of a license precludes any protections of the licensee as against interferences with the licensee's use by the licensor.") The right to durational use of hotel facilities is a product of contract, rather than an incident of real estate tenancy. *Fin. Sec. Assurance, Inc., v. Days Cal. Riverside Ltd. Partnership,* 1992 WL 471706 (E.D.Cal.1992) (quoting *Stowe v. Fritzie Hotels, Inc.,* 44 Cal.2d 416, 421, 282 P.2d 890 (1955); *In re Nendels–Medford Joint Venture,* 127 B.R. at 663; *Kearney Hotel Partners v. Richardson (In re Kearney Hotel Partners),* 92 B.R. 95, 99 (Bankr.S.D.N.Y.1988).

Maine's highest court has acknowledged that hotel and motel guests contract for something other than use and possession of property and has refused to extend to them the benefit of tenants' statutory protection from retaliatory or summary evictions.

"Where ... a person occupies a room in a hotel, registers as others do, receives maid service and has the benefit of other incidental services that the hotel gives, she is a guest, and this is true in spite of the fact that her stay may be a long one and that she may pay on a weekly or monthly basis."

*Sawyer v. Congress Square Hotel Co.,* 157 Me. at 114–15, 170 A.2d 645 (holding that hotel guest is not entitled to same statutory notice of eviction as tenant) (quoting *Levesque v. Columbia Hotel,* 141 Me. 393, 401–02, 44 A.2d 728 (1945)).[13] *Cf., e.g.,* 14 M.R.S.A. § 6001, *et seq.* (forcible entry and detainer remedies including notice requirements for tenants including tenants at will); 14 M.R.S.A. § 6014 (statutory remedies for illegal eviction); 14 M.R.S.A. § 6025 (regulating access to leased premises and requiring landlord to give advance notice of intent to enter).[14]

---

**13.** The quoted passage is not cited for the proposition, and I do not hold, that persons occupying rooms in a hotel or motel may never be or become tenants paying rent under any circumstances. *See* n. 15 *infra.*

**14.** Although in a very different context, there exists Maine authority that may be read as indicating that, for purposes of subdivision regulation, motel operations do not entail a significant "splitting off" of rights in real property. *Town of York v. Cragin,* 541 A.2d 932, 936 (Me.1988) (Glassman, J., concurring in part and dissenting in part).

In *Town of York v. Cragin,* the Law Court held that constructing and operating a motel on a single parcel of land did not trigger state subdivision regulations. 541 A.2d at 934. The majority did not opine whether motel opera-

tions involved "splitting off" real estate interests of greater dignity than the interests of transient campers at a campground. *Id.* at n. 3. The court had previously held that such activities were insufficient to trigger subdivision regulation in *Planning Bd. of the Town of Naples v. Michaud,* 444 A.2d 40, 42 (Me.1982). Rather, *Cragin*'s majority concluded that operating a hotel did not divide a parcel of land into lots as the statute contemplated. 541 A.2d at 934.

Justice Glassman, with whom Chief Justice McKusick concurred, agreed with the majority's decision, but did so on the ground that the relationship of guests to the motel rooms was "tenuous," and, therefore, that there was "no splitting off of a sufficient real estate interest to constitute a division of land...." *Id.* at 936.

### ii. *"Profits."*

■ There is some authority holding that hotel room revenues, although not "rents" are "profits" for § 552(b) purposes. *In re Miami Center Associates, Ltd.,* 144 B.R. at 941; *In re Mid–City Hotel Associates,* 114 B.R. at 641. The *Mid–City* court, whose rationale was adopted in *Miami Center,* relied a law dictionary definition of "profits," defining the term as extending to "every available return" from real estate "whether it arises above or below the surface." *Id.* Viewing the issue under Maine law, I cannot agree for purposes of determining the character of revenues generated by hotel or motel operations. Maine's highest court has recognized that an hotelier operates a service business. *Sawyer v. Congress Square Hotel Co.,* 157 Me. 111, 114–15, 170 A.2d 645. Room revenues flow from the operation of that business. They are not "the right take from the land of another a part of the soil, or something which is a product of the soil." *Beckwith v. Rossi,* 157 Me. 532, 534, 175 A.2d 732 (1961), Therefore, they are not "profits" of the real estate.

Thus, room revenues from hotel or motel operations are neither rent nor profits of real estate under Maine law. This conclusion result is consistent not only with *Majestic Motel,* but with the majority of cases on the point from other jurisdictions, as well.[15] *See, e.g., Fin. Sec. Assurance, Inc. v. Days Cal. Riverside Ltd. Partnership,* 1992 WL 471706; *U.S. v. PS Hotel Corp.,* 404 F.Supp. 1188 (E.D.Mo.1975), *aff'd,* 527 F.2d 500 (8th Cir.1975) (per curiam); *In re Northview Corp.,* 130 B.R. 543 (Bankr.9th Cir.BAP 1991); *In re Ashoka Enterprises, Inc.,* 125 B.R. 845 (Bankr.S.D.Fla.1990); *In re Shore Haven Motor Inn, Inc.,* 124 B.R. 617 (Bankr.S.D.Fla.1991); *In re Sacramen-* *to Mansion, Ltd.,* 117 B.R. 592 (Bankr. D.Colo.1990); *In re Oceanview/Virginia Beach Real Estate Assoc.,* 116 B.R. 57 (Bankr.E.D.Va.1990); *In re Mid–City Hotel Assoc.,* 114 B.R. 634; *In re Inv. Hotel Properties, Ltd.,* 109 B.R. 990 (Bankr. D.Colo.1990); *In re Blue Ridge Motel Associates,* 106 B.R. 81 (Bankr.W.D.Pa.1989); *In re Ashkenazy Enterprises, Inc.,* 94 B.R. 645 (Bankr.C.D.Cal.1986); *In re Kearney Hotel Partners,* 92 B.R. 95 (Bankr. S.D.N.Y.1988); *In re Greater Atl. & Pac. Inv. Group, Inc.,* 88 B.R. 356 (Bankr. N.D.Okl.1988).

### b. *"Products"* and *"Proceeds."*

■ Casco argues that if the motel room revenues are not rents, they are "products" or "proceeds" under the security documents, § 552(b) and Maine law. Under Maine's U.C.C. "proceeds" means "whatever is received upon the sale, exchange, collection or other *disposition* of collateral or proceeds." 11 M.R.S.A. § 9–306(1) (emphasis added). Section 552(b)'s legislative history indicates that the concept of "proceeds" is not necessarily limited to the "technical definition of that term under the U.C.C." It states that the term may extend to "any property into which property subject to the security interest is converted."[16] Even under such an expansive notion of the term, room revenues are not proceeds. Casco can not demonstrate that any of its collateral has been disposed of or converted in the generation of motel room revenues.

Neither are room revenues "products." A "product" is whatever is produced when goods are so "manufactured, processed, as-

---

**15.** Casco asserts that the *Majestic Motel* rule is unworkable in cases where a hotel or motel, in full or in part, houses permanent residents. The debtor has represented, and Casco does not dispute, that there are no long-term residents at the Heritage. It serves transient guests only. Each case must be decided on its own facts. Treatment of revenues generated from long-term living arrangements in hotels, motels or similar facilities under § 552(b) must await another day.

**16.** H.R.Rep. 595, 95th Cong., 1st Sess. 377 (1977). In light of the express language of the statute itself, the legislative history must mean that state law principles, such as those relating to tracing, may be tapped to find "proceeds" in circumstances without definition found in the U.C.C. It cannot mean that a definition of "proceeds" incompatible with the applicable nonbankruptcy law holds sway. *See Patterson v. Shumate,* 504 U.S. ——, —— – ——, 112 S.Ct. 2242, 2246–47, 119 L.Ed.2d 519 (1992).

sembled or commingled" that their identity is lost. 11 M.R.S.A. § 9–315.[17]

### c. Wrapping Up.

In view of § 552(b)'s injunction to give postpetition effect to a security interest only in the "proceeds, products, offspring, rents or profits" of prepetition collateral in accordance with applicable nonbankruptcy law and the content of Maine law, the rationales of *S.F. Drake* and *Miami Center* are unconvincing. Both cases place undue weight on the parties' intention to secure a loan to a hotel or motel owning entity "six ways to Sunday." *See Miami Center*, 144 B.R. at 941; *S.F. Drake*, 131 B.R. at 161. Under § 552(b) that cannot be determinative.

 If the revenues at issue are not rents (or another category of excepted collateral under § 552(b)), a continuing security interest in them is cut off at bankruptcy by § 552(a). Lender and borrower are not free to upset the statutory scheme by adopting a contractual definition of a collateral category that is broader than the state law legal definition. *See Fin. Sec. Assurance, Inc. v. Days Cal. Riverside Ltd. Partnership*, 1992 WL 471706 at *4.[18]

One cannot dispute Casco's assertion that some portion of room revenues derives from the real property on which the motel sits. But every business is located some-where. Under the Bankruptcy Code's provisions governing the postpetition effect of security interests, there can be no continuing, postpetition lien unless the collateral is one of the § 552(b) species.[19] In addition to being an unwieldy process, to apportion motel room revenues among the multiple sources and activities from which it is derived and to label some portion derivative of the real estate as "rent" would be contrary to this court's obligation to apply the Bankruptcy Code and applicable nonbankruptcy law as it is.[20]

### CONCLUSION.

Because Casco's lien does not operate to encumber revenues generated by the debtor's motel operation, those revenues are not cash collateral. Therefore, the motion seeking an order limiting the debtor's continuing use of motel room receipts in the postpetition operation of its business is denied. An appropriate order shall enter forthwith.

---

17. There is no claim of a security interest in "offspring," the only remaining § 552(b) exception not discussed.

18. Of course, parties may negotiate a security agreement that defines the collateral more narrowly than the statute permits. For example, Casco's assignment of rents and profits is limited to those "rents, profits, revenues, royalties, bonuses, rights and benefits under any and all *leases or tenancies....*" (Emphasis added.) Indeed, its terms expressly contemplate rents generated in the context of landlord/tenant or lessor/lessee relationships. There are no leases for the debtor's motel's guests. *See supra* n. 15. The analysis of Maine law set forth above demonstrates that hotel and motel guests do not hold "tenancies" in the debtor's property.

19. One of Casco's criticisms of *Majestic Motel* is that, although it holds that room revenues are not "rents," it does not define what they are. For present purposes, it is enough to determine what they are *not*. They are not "proceeds, product, offspring, rents, or profits" of Casco's prepetition collateral. Most courts that have spoken on the point have determined that they are "accounts" or "accounts receivable." *See, e.g., In re Northview Corp.*, 130 B.R. 543, 548 (accounts); *In re Shore Haven Motor Inn, Inc.*, 124 B.R. 617, 618 (accounts receivable); *In re Inv. Hotel Properties, Ltd.*, 109 B.R. 990, 996 (accounts receivable); *In re Ashkenazy Enterprises, Inc.*, 94 B.R. 645, 647 (accounts). That is a sensible conclusion under Maine law, as well. *See Farnum v. C.J. Merrill, Inc.*, 264 A.2d 150, 154–55 (Me.1970). In some cases, of course, they may simply be cash.

20. The Bankruptcy Code employs categories to separate classes of postpetition collateral for different treatment under § 552(b). The content of each is identified by definitions and distinctions, some fine, some gross. The Code directs the bankruptcy court to employ state law to categorize collateral and to apply Code and non-Code law accordingly. It is, of necessity, "a matter of approximations in the realm of the imperfect...." John Updike, *Rabbit is Rich* at 179 (Knopf 1981).