### In re The WRIGHT GROUP, INC., Debtor.

### No. 10–23187 JPK.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

Feb. 15, 2011.

Daniel L. Freeland, Esq. and Frederick L. Carpenter, Esq., Highland, IN, for the Debtor.

David E. Woodward, Esq., for the creditor Fifth Third Bank.

*ORDER DETERMINING THE INTER-ESTS OF FIFTH THIRD BANK IN THE DEBTOR'S RECEIPTS FROM THE OPERATION OF ITS MINIA-TURE GOLF COURSE FACILITY*

J. PHILIP KLINGEBERGER, Bankruptcy Judge.

On July 8, 2010, The Wright Group, Inc. ("Wright")—the debtor-in-possession in Chapter 11 case number 10–23187—filed its Emergency Motion for Use of Fifth Third Bank's Cash Collateral. Paragraph 7 of this motion stated:

> 7. Debtor receives income from the customers' use of the miniature golf facility which it contends is not cash collateral. The income generated from said use is incidental to the entire amusement operation and is dependant on the participants paying green fees. The cash generated by the Debtor's use of the balls and clubs in its business does not equate to proceeds of the equipment. The cash generated from the operation of the miniature golf course is derived primarily from the time and energy expended by the miniature golf course employees in maintaining the miniature golf course, collecting balls and maintaining the equipment necessary to do so.

The ball was advanced down the fairway with respect to Wright's use of acknowledged cash collateral of Fifth Third Bank ("Fifth Third") by the entry of a series of interim cash collateral orders which avoided the issue raised by paragraph 7 of Wright's July 8, 2010 motion. However, by the time the hearing was held on July 22, 2010 with respect to extended use of cash collateral, it became apparent that the issue raised by paragraph 7 could no longer be left in the rough. By order entered on October 1, 2010, the court initiated a procedure for determination of that issue (record entry # 66), a procedure

which was further implemented by a telephonic conference held on October 26, 2010 (record entry # 76). Pursuant to that order, a final evidentiary hearing on the foregoing issue was held on November 29, 2010. At that hearing, the court stated its provisional conclusions concerning certain issues, but reserved its decision as a whole.

The general issue before the court is a narrow one, and may be stated as follows:

Do the receipts derived by Wright from operation of its miniature golf course facility constitute "cash collateral" as defined by 11 U.S.C. § 363(a), so that Wright's use of those receipts is subject to 11 U.S.C. § 363(c)(2)?

Sub-issues within the general issue are the following:

1. How are Wright's interests in the receipts to be classified as an interest in property under applicable law?

2. Based upon the nature of Wright's property interests in the receipts, does Fifth Third have a security interest in the receipts?

3. If Fifth Third has a security interest in the receipts, was that security interest perfected for the purposes of 11 U.S.C. § 363(a)?

4. What is the impact of 11 U.S.C. § 552 on the extent of Fifth Third's interests?

The matter before the court is a contested matter pursuant to Fed.R.Bankr.P. 9014. This contested matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K) and (M). The court has final judgment jurisdiction with respect to 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and (b), and N.D.Ind.L.R. 200.1(a)(1) and (2). Pursuant to Fed.R.Bankr.P. 9014(c)/ Fed.R.Bankr.P. 7054/Fed.R.Civ.P. 54(b), this order determines less than all claims involved in Wright's July 8, 2010 motion; however, the court directs entry of a final judgment with respect to the issues addressed by this order, and expressly determines that there is no just reason for delay with respect to the finalization of the determination made by this order.

## I. *LEGAL ANALYSIS*

The facts are straight-forward. Wright operates an amusement facility in Valparaiso, Indiana. The facility includes a miniature golf course. Patrons of the miniature golf course pay a pre-designated fee to play miniature golf on the course, and this fee is collected in cash at the "portal" of the course before individuals are allowed to use the course. If they so desire, patrons are provided with a putter, a golf ball, a scorecard, and a pencil. These items are provided without any additional charge, and are in essence "thrown in" as part of the transaction for the patron's playing miniature golf on the miniature golf course. If one were so inclined, one could bring one's own putter and/or one's own golf ball to play miniature golf on the miniature golf course. The putters and golf balls supplied by Wright are never subject to a separate bailment or lease to patrons, i.e., one cannot rent a putter or a ball and remove it from the premises, legally.[1] As stated, in exchange for being allowed on the premises to play miniature golf, patrons pay a fee which is collected in cash before they are allowed admission to the course. It is these cash receipts that are at issue in this case.

The classification of Wright's interests in the cash receipts is an extremely interesting issue. Wright concedes that Fifth Third Bank has a perfected security inter-

---

1. At the November 29, 2010 hearing, it was noted by Wright's counsel that a surprising number of miniature golf course balls (washed thousands of times over the course of their usable life) are stolen by patrons. This unauthorized theft of property does not in any manner affect the nature of the transaction between Wright and its patrons.

est in the tangible property supplied by Wright for use by patrons of the miniature golf course, i.e., the putters, the balls, the scorecards and the pencils. Thus, if the transaction between Wright and its patrons were to be viewed as rental of these items of property, one might well argue that the cash receipts are proceeds of these items of tangible property, which would lead to a certain course of conclusions with respect to Fifth Third's security interests, the classification of those interests as "cash collateral", and the ramifications of 11 U.S.C. § 552 with respect to those interests. If one were instead to determine that the allowed use of these items of personal property by patrons was essentially incidental to the focus of the underlying transaction—the authorization to play miniature golf on the miniature golf course—then a different set of conclusions would arise. Additionally, one might creatively assert that the counter transaction between Wright and its patrons generated an "account" for the purposes of Article 9 of the Uniform Commercial Code, and that upon the patron's payment of this "account", the amount received from the patron constituted "proceeds" of the account. Conversely to this contention, one might argue that the transaction is a simultaneous exchange of cash for access to the miniature golf course; that no "account" is involved in any way; and that the receipts are simply "money" under Article 9 of the Uniform Commercial Code.

The court determines the following:

1. The focus of the transaction between Wright and its patrons is the patron's access to the miniature golf course. This is a "license" for access to real property.

2. The provision of putters, balls, scorecards and pencils, being totally elective on the part of the patron, is not a transaction which gives rise to the generation of "proceeds" from tangible personal property.

3. The receipts derived by Wright from the license arrangement with its patrons are "cash": they do not derive from an account between Wright and the patrons, and therefore cannot be deemed to be proceeds of an account.

4. Fifth Third has a security agreement with Wright which provides for a security interest in cash and monies; however, that security interest was not perfected because Fifth Third did not take possession of the cash receipts.

5. A predicate for the existence of "cash collateral" under 11 U.S.C. § 363(a) is that a creditor have a perfected security interest in property of a debtor's estate. Absent a perfected security interest, the creditor's interest is avoidable by the debtor utilizing avoidance powers in Chapter 5 of the Bankruptcy Code, and the issue of use of cash collateral becomes moot.

6. The counter transaction between Wright and its patrons is a singular event, generating cash/money as its product. The "proceeds" of these customer transactions is the cash/money received at the time of receipt, and there are no "proceeds" other than those immediately generated by the counter transaction. As a result, pursuant to 11 U.S.C. § 552(a), Fifth Third's security interest is limited to the cash/money received by Wright from patrons for the use of the miniature golf course prior to the date of the debtor's filing of bankruptcy. These receipts received on or after July 8, 2010 were acquired by Wright's bankruptcy estate after the commencement of the case, and pursuant to 11 U.S.C. § 552(a) post-petition receipts from patrons of the miniature golf course are not subject to Fifth Third's security interest. Because Fifth Third did not perfect its security interests in these receipts, property held by the debtor on the date of the petition which are traceable to these receipts do not constitute "pro-

ceeds, products, offspring, or profits" within the provisions of 11 U.S.C. § 552(b)(1).

Because of the novelty of the issues presented, particularly with respect to the arrangement between Wright and its patrons for use of real property, the court directed the parties to separately address whether security interests [as defined by 11 U.S.C. § 101(51)] of Fifth Third in the receipts derived from patrons for use of the miniature golf course could be perfected under real property law, particularly by provisions in a mortgage. Fifth Third has conceded that Indiana state law deems the interest of patrons to access the miniature golf course premises to be a mere license which does not give rise to any form of interest in real estate, and that the proceeds received from this license cannot be subject to a security interest perfected under real property law. The court concurs with the legal conclusion of Fifth Third completely.[2]

■ The transaction between Wright and a patron for use of the miniature golf course by the patron is a license under Indiana law; *Industrial Disposal Corporation of America v. City of East Chicago, Department of Water Works*, Ind.App., 407 N.E.2d 1203, 1206 (1980) ["(A) license merely confers a privilege to do some act or acts on the land without possessing any estate therein ... so long as it is executory [it] may be revoked at will".] While many patrons probably take advantage of the provision of a putter and a ball, and keep score with the scorecard and the pencil, that is elective on their part: their principal focus is to play miniature golf or to practice putting (as much as one can do so on artificial surfaces), and it is this access to the premises for which the fee is paid. Patrons are allowed to use the provided putters and the balls, but those items of property are not in any manner leased to them—they are simply provided as part of the miniature golf course access transaction—much as dinnerware, silverware and glassware are provided to restaurant patrons. There is no authorization for a patron to remove a putter or a ball from the premises, as contrasted to a hypothetical circumstance in which a business engaged in rental of property to patrons which specialized solely in rental of golf clubs and golf balls actually does lease that property to patrons, resulting in proceeds from the lease.[3]

Given that the nature of the transaction between Wright and its miniature golf course patrons is a license to use the miniature golf course, how are the receipts from the patrons' payment for this license to be characterized? A transaction goes like this. The patron approaches a counter at the miniature golf course and expresses his/her desire to play miniature golf, or to otherwise use the miniature golf course. The fee set for this privilege is uniform, and it is paid in cash before the

2. As was stated on the record on November 29, 2010, the court wishes to expressly commend Attorney David Woodward and his firm for acknowledging a very clear legal result, and for not burdening the record with arguments seeking to sustain other than a foregone conclusion. Would that more attorneys who appear before the court would do the same.

3. The court has decided that in this opinion it will not discuss cases from other jurisdictions on any of the presented issues. First, there are very few cases which are on point as to the specific issues which are the subject of this decision. Second, none of the cases on point or perhaps analogous are binding on the court. Third, the analyses in cases which deal with potentially similar issues are highly disparate, and the court deems that there is no point to be served in analyzing them separately to explain why the court does not agree with them. The issue presented to the court is a case of first impression as far as binding authority goes, and the court's analysis is what it is without discussion of other decisions.

patron is allowed to enter the miniature golf course: there are no promissory notes, there are no open accounts, there are no IOUs—if you don't pay, you don't play. This transaction involves either an account, or simply money.

■ IC 26-1-9.1-102(2) defines "account" for the purposes of Article 9 of the Indiana Uniform Commercial Code as follows:

(2) "Account", except as used in "account for", means a right to payment of a monetary obligation, whether or not earned by performance:

(A) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of;

(B) for services rendered or to be rendered;

(C) for a policy of insurance issued or to be issued;

(D) for a secondary obligation incurred or to be incurred;

(E) for energy provided or to be provided;

(F) for the use or hire of a vessel under a charter or other contract;

(G) arising out of the use of a credit or charge card or information contained on or for use with the card; or

(H) as winnings in a lottery or other game of chance operated or sponsored by a state other than Indiana, a governmental unit of a state, or a person licensed or authorized to operate the game by a state or governmental unit of a state.

The term does not include a right to a payment of a prize awarded by the state lottery commission in the Indiana state lottery established under IC 4-30. The term includes health-care-insurance receivables. The term does not include (i) rights to payment evidenced by chattel paper or an instrument, (ii) commercial tort claims, (iii) deposit accounts, (iv) investment property, (v) letter-of-credit

rights or letters of credit, or (vi) rights to payment for money or funds advanced or sold, other than rights arising out of the use of a credit or charge card or information contained on or for use with the card.

IC 26-1-9.1-102(3) defines account debtor as follows:

(3) "Account debtor" means a person obligated on an account, chattel paper, or general intangible. The term does not include persons obligated to pay a negotiable instrument, even if the instrument constitutes part of chattel paper.

The term "obligor" is defined by IC 26-1-9.1-102(59) as follows:

(59) "Obligor" means a person that, with respect to an obligation secured by a security interest in or an agricultural lien on the collateral, (i) owes payment or other performance of the obligation, (ii) has provided property other than the collateral to secure payment or other performance of the obligation, or (iii) is otherwise accountable in whole or in part for payment or other performance of the obligation. The term does not include issuers or nominated persons under a letter of credit.

The Uniform Commercial Code Comment with respect to the definition of "Account Debtor" states the following:

h. **"Account Debtor."** An "account debtor" is a person obligated on an account, chattel paper, or general intangible. The account debtor's obligation often is a monetary obligation; however, this is not always the case. For example, if a franchisee uses its rights under a franchise agreement (a general intangible) as collateral, then the franchisor is an "account debtor." As a general matter, Article 3, and not Article 9, governs obligations on negotiable instruments. Accordingly, the definition of "account

debtor" excludes obligors on negotiable instruments constituting part of chattel paper. The principal effect of this change from the definition in former Article 9 is that the rules in Sections 9–403, 9–404, 9–405, and 9–406, dealing with the rights of an assignee and duties of an account debtor, do not apply to an assignment of chattel paper in which the obligation to pay is evidenced by a negotiable instrument. (Section 9–406(d), however, does apply to promissory notes, including negotiable promissory notes.) Rather, the assignee's rights are governed by Article 3. Similarly, the duties of an obligor on a nonnegotiable instrument are governed by non-Article 9 law unless the nonnegotiable instrument is a part of chattel paper, in which case the obligor is an account debtor.

As the foregoing definitions demonstrate, the essence of an "account" is either that services or goods or credit *has been provided* to a person who has not yet repaid the provider, or that the arrangement between the provider and the provided contemplates the future provision of goods, services or credit for which the provided person will then be obligated; *See,* the concept of "open account" defined in *Smither v. Asset Acceptance, LLC,* Ind. App., 919 N.E.2d 1153, 1159 (2010). Absent an outstanding obligation there is no obligor, and as a result there can never be an account debtor. The nature of the transaction between Wright and its patrons is that the patron is not allowed access to the use of the miniature golf course before payment of the fee is made to Wright. This is a simultaneous transaction, if you will, by which Wright grants the license for use of the miniature golf course at the same time as the customer pays the fee for that license. No "account" is generated. Because no account is generated, there can be no "proceeds" arising from this transaction. This is be-

cause IC 26–1–9.1–102(12) defines "collateral" as follows:

(12) "Collateral" means the property subject to a security interest or agricultural lien. The term includes:

(A) proceeds to which a security interest attaches;

(B) accounts, chattel paper, payment intangibles, and promissory notes that have been sold; and

(C) goods that are the subject of a consignment.

The term "proceeds" is defined by IC 26–1–9.1–102(64) as follows:

(64) "Proceeds", except as used in IC 26–1–9.1–609(b), means the following property:

(A) Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral.

(B) Whatever is collected on, or distributed on account of, collateral.

(C) Rights arising out of collateral.

(D) To the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral.

(E) To the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

The key concept is IC 26–1–9.1–102(64)(B), which defines "proceeds" as that which "is collected on, or distributed on account of, collateral". The "collateral" in the instant case is a cash receipt, and nothing is "collected on, or distributed on account of" that form of property.

■ Let's address one other possible categorization of the receipts, i.e., a "gen-

eral intangible" defined by IC 26–1–9.1–102(42) as follows:

(42) "General intangible" means any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software.

A "payment intangible" is a sub-category of "general intangible" defined by IC 26–1–9.1–102(61) to be:

(61) "Payment intangible" means a general intangible under which the account debtor's principal obligation is a monetary obligation.

The Uniform Commercial Code Comment to the foregoing two sections states the following:

d. **"General Intangible"; "Payment Intangible."** "General intangible" is the residual category of personal property, including things in action, that is not included in the other defined types of collateral. Examples are various categories of intellectual property and the right to payment of a loan of funds that is not evidenced by chattel paper or an instrument. As used in the definition of "general intangible," "things in action" includes rights that arise under a license of intellectual property, including the right to exploit the intellectual property without liability for infringement. The definition has been revised to exclude commercial tort claims, deposit accounts, and letter-of-credit rights. Each of the three is a separate type of collateral. One important consequence of this exclusion is that tortfeasors (commercial tort claims), banks (deposit accounts), and persons obligated on letters of credit (letter-of-credit rights) are not "account debtors" having the rights and obligations set forth in Sections 9–404, 9–405, and 9–406. In particular, tortfeasors, banks, and persons obligated on letters of credit are not obligated to pay an assignee (secured party) upon receipt of the notification described in Section 9–404(a). See Comment 5.h. Another important consequence relates to the adequacy of the description in the security agreement. See Section 9–108.

"Payment intangible" is a subset of the definition of "general intangible." The sale of a payment intangible is subject to this Article. See Section 9–109(a)(3). Virtually any intangible right could give rise to a right to payment of money once one hypothesizes, for example, that the account debtor is in breach of its obligation. The term "payment intangible," however, embraces only those general intangibles "under which the account debtor's *principal* obligation is a monetary obligation." (Emphasis added.)

In classifying intangible collateral, a court should begin by identifying the particular rights that have been assigned. The account debtor (promisor) under a particular contract may owe several types of monetary obligations as well as other, nonmonetary obligations. If the promisee's right to payment of money is assigned separately, the right is an account or payment intangible, depending on how the account debtor's obligation arose. When all the promisee's rights are assigned together, an account, a payment intangible, and a general intangible all may be involved, depending on the nature of the rights. A right to the payment of money is frequently buttressed by ancillary covenants, such as covenants in a purchase agreement, note, or mortgage requiring insurance on the collateral or forbidding removal of the collateral, or covenants to preserve the creditworthiness of the promisor, such as covenants restricting

dividends and the like. This Article does not treat these ancillary rights separately from the rights to payment to which they relate. For example, attachment and perfection of an assignment of a right to payment of a monetary obligation, whether it be an account or payment intangible, also carries these ancillary rights.

Every "payment intangible" is also a "general intangible." Likewise, "software" is a "general intangible" for purposes of this Article. See Comment 25. Accordingly, except as otherwise provided, statutory provisions applicable to general intangibles apply to payment intangibles and software.

With respect to the foregoing, it must first be noted that a "general intangible" specifically excludes "money" from its scope. The Comment makes clear that the concept of a "general intangible" in terms of some form of property interest arising between the debtor providing a security interest and another entity with respect to whom that securing debtor has entered into a transaction giving rise to some interest in property, is the existence of a debt, again an obligation owed for something already provided or promised to be provided in a binding contractual arrangement. As stated above, the counter transaction between Wright and its customer does not generate a debt, and for reasons similar to those stated above which establish that the transaction between Wright and its customer cannot give rise to an account, that transaction does not give rise to a "general intangible" either. So, what is the now obvious result? Before he/she is allowed to enter the miniature golf course, the customer pays cash to Wright. That cash is "money". Thus, the counter transaction generates a form of property possessed by Wright which is "money".

Included in the documents filed by Fifth Third as record entry # 90 is a "security agreement" entered into between Wright

and Fifth Third on November 29, 2005. Paragraph 2(b) of this document provides Fifth Third with a security interest in all "monies, cash ... owned by debtor or in which debtor has an interest". Thus, Fifth Third has a security interest in "cash" and "monies" of Wright. The term "money" is defined as follows by IC 26–1–1–201(24):

(24) "Money" means a medium of exchange authorized or adopted by a domestic or foreign government and includes a monetary unit of account established by an intergovernmental organization or by agreement between two (2) or more nations.

The payments received at the counter by Wright from patrons are clearly "money" pursuant to the foregoing definition.

How is a security interest in "money" perfected? That answer is provided by IC 26–1–9.1–312(b)(3) as follows:

(b) Except as otherwise provided in IC 26–1–9.1–315(c) and IC 26–1–9.1–315(d), for proceeds:

. . .

3) a security interest in money may be perfected only by the secured party's taking possession under IC 26–1–9.1–313.

Pursuant to IC 26–1–9.1–313(a), "a secured party may perfect a security interest in ... money ... by taking possession of the collateral". This term means exactly what it states: the secured party must have actual, physical possession of money in order to have perfected a security interest in that form of collateral.

Fifth Third was not in possession of any of the receipts from the miniature golf course at the time the debtor's petition was filed. As a result, Fifth Third did not have a perfected security interest in those receipts. The term "cash collateral" is defined by 363(a) as follows:

(a) In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

Implicit in the concept of "cash collateral" is that a creditor has an enforceable security interest in the subject collateral; *see, In re Fricks,* 58 B.R. 883 (Bankr.N.D.Ala. 1986). An enforceable security interest means one which the debtor could not avoid. A judgment lien in Indiana creates only a lien against real estate and chattels real, and thus would not create a lien against cash, thus obviating the use of 11 U.S.C. § 544(a)(1). 11 U.S.C. § 544(a)(2) provides a Chapter 11 debtor with a hypothetical status of "a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists". Under Indiana law, "the judgment creditor secures a lien upon the goods and chattels of the debtor when an execution is issued"; *Coldren v. American Milling Research & Development Institute, Inc.,* Ind.App. 177 Ind.App. 134, 378 N.E.2d 870 (1978); *Deetz v. McGowan,* Ind.App., 403 N.E.2d 1160, 1164 (1980). Whether or not the execution is returned unsatisfied is immaterial to the acquisition of the lien under Indiana law. Thus, when a execution is issued, under Indiana law a judgment creditor obtains a lien against the general property of the debtor, which would include money.

In *McGoldrick, et al. v. Slevin, et al.,* 43 Ind. 522 (1873), the Indiana Supreme Court stated:

The judgments having been rendered upon honest debts and according to law, and executions having been issued and placed in the hands of the sheriff, the judgment creditors acquired a lien on the property which was prior and paramount to the claims of other creditors who had no judgments.

IC 26–1–9.1–317(a) states:

(a) A security interest or agricultural lien is subordinate to the rights of:

(1) a person entitled to priority under IC 26–1–9.1–322; and

(2) except as provided in subsection (e), a person that becomes a lien creditor before the earlier of the time:

(A) the security interest or agricultural lien is perfected; or

(B) one (1) of the conditions specified in IC 26–1–9.1–203(b)(3) is met;

and a financing statement covering the collateral is filed.

IC 26–1–9.1–322 is not applicable in the context of this case. Fifth Third did not perfect its security interest in money, and thus IC 26–1–9.1–317(a)(2)(A) has no relevance. With respect to the provision of IC 26–1–9.1–317(a)(2)(B), IC 26–1–9.1–203(b)(3) states:

(3) one (1) of the following conditions is met:

(A) The debtor has authenticated a security agreement that provides a description of the collateral and, if the security interest covers timber to be cut, a description of the land concerned.

(B) The collateral is not a certificated security and is in the possession of the secured party under IC 26–1–9.1–313

pursuant to the debtor's security agreement.

(C) The collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under IC 26–1–8.1–301 pursuant to the debtor's security agreement.

(D) The collateral is deposit accounts, electronic chattel paper, investment property, letter-of-credit rights, or electronic documents, and the secured party has control under IC 26–1–7–106, IC 26–1–9.1–104, IC 26–1–9.1–105, IC 26–1–9.1–106, or IC 26–1–9.1–107 pursuant to the debtor's security agreement.

Sub-paragraphs (B), (C) and (D) of the foregoing statute do not apply in this case. With respect to IC 26–1–9.1–203(b)(3)(A), the Uniform Commercial Code Comment regarding the meaning of "authentication" states the following:

3. **Security Agreement; Authentication.** Under subsection (b)(3), enforceability requires the debtor's security agreement and compliance with an evidentiary requirement in the nature of a Statute of Frauds. Paragraph (3)(A) represents the most basic of the evidentiary alternatives, under which the debtor must authenticate a security agreement that provides a description of the collateral. Under Section 9–102, a "security agreement" is "an agreement that creates or provides for a security interest." Neither that definition nor the requirement of paragraph (3)(A) rejects the deeply rooted doctrine that a bill of sale, although absolute in form, may be shown in fact to have been given as security. Under this Article, as under prior law, a debtor may show by parol evidence that a transfer purporting to be absolute was in fact for security. Similarly, a self-styled "lease" may serve as a security agreement if the agreement creates a security interest. See Section

1–201(37) (distinguishing security interest from lease).

The circumstances in which the concept of "authentication" operates are not present in this case. Moreover, the debtor has not "authenticated" the security agreement in the manner required by IC 26–1–9.1–203(b)(3)(A).

As stated, perfection of a security interest in money requires the secured party to take possession of the money. IC 26–1–9.1–313(d) states:

(d) If perfection of a security interest depends upon possession of the collateral by a secured party, perfection occurs not earlier than the time the secured party takes possession and continues only while the secured party retains possession.

Thus, Fifth Third never perfected its security interest in the receipts received by the debtor from operation of the miniature golf course facility. Finally, the subordination of security interests in money to claims of others who might assert an interest as money as the subject collateral is indicated by IC 26–1–9.1–332(a), which states:

(a) A transferee of money takes the money free of a security interest unless the transferee acts in collusion with the debtor in violating the rights of the secured party.

Putting all of the foregoing together results in the determination that Fifth Third's security interest in money is avoidable pursuant to 11 U.S.C. § 544(a)(2).

As a result, Wright could avoid the unperfected security interest of Fifth Third in the cash receipts which existed on the date of the petition. While admittedly an avoidance action is subject to the provisions of Fed.R.Bankr.P. 7001(2) in terms of an adversary proceeding, in the context of the matter before the court, the court

deems the issue of the perfection of Fifth Third's security interest to be within the scope of the issues submitted to the court by the parties for determination, particularly in light of Fed.R.Bankr.P. 9014(c)/ Fed.R.Bankr.P. 7054/Fed.R.Civ.P. 54(c), which provides that a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings". Both parties have submitted this matter to the court in part upon issues relating to perfection of Fifth Third's security interest, and thus by implication they have authorized the court to invoke the foregoing procedures in this contested matter.

■■■ Based upon the foregoing, because Fifth Third did not have a perfected security interest in the receipts from the miniature golf course in existence on the date of the debtor's filing of its bankruptcy petition, Fifth Third had no interest in "cash collateral" which it could enforce pursuant to 11 U.S.C. § 363(c)(2).

■■■ Finally, we come to the provisions of 11 U.S.C. § 552. Sub-paragraph (c) of this statute is specifically limited to property of the debtor "for the use or occupancy of rooms or other public facilities in hotels, motels or other lodging properties", a category of collateral not applicable in this case. 11 U.S.C. § 552(a) and (b) state:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case. (b)(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

First, *any security interest* which Fifth Third may have had in the miniature golf course receipts collected by the debtor for use of the miniature golf course on or after the date of the filing of the petition was eviscerated by 11 U.S.C. § 552(a). The greatest interest that Fifth Third could have would be if the pre-petition receipts still in the debtor's possession on the date of filing constituted "proceeds, products, offspring or profits" of miniature golf course use prior to the date of the petition. Because the transactions between Wright and its patrons for use of the miniature golf course were immediately closed as soon as they were effected and resulted in "money" as a form of collateral, there are no "proceeds" from these pre-petition transactions. Therefore, apart from any consideration of the issues addressed above, any receipts from miniature golf course patrons obtained by Wright on or after the date of the filing of the petition are free of the security interest of Fifth Third, and do not constitute "cash collateral" which the debtor must seek Fifth Third's consent, or a court order, to use.

Based upon the foregoing, the court determines as follows:

1. The receipts obtained by Wright from payment from its miniature golf course patrons were received in consideration of the patrons' privilege to use the miniature golf course, i.e., the provision of

a license for the use of real estate by Wright.

2. The receipts obtained by Wright of the patrons of the miniature golf course are "money" under Article 9 of the Uniform Commercial Code. By virtue of its security agreement with Wright, Fifth Third had a security interest in Wright's money in existence on the date prior to filing of the debtor's bankruptcy petition.

3. Security interests in money can only be perfected by possession. Fifth Third did not have possession of Wright's money, and therefore it had no perfected security interest in the receipts.

4. Because it had no perfected security interest in the receipts. Fifth Third's security interest in the receipts is avoidable by the debtor pursuant to 11 U.S.C. § 544(a)(2).

5. 11 U.S.C. § 363(a) is premised upon the basis that a creditor has an enforceable, perfected, and unavoidable security interest in property which might otherwise constitute "cash collateral" under that section. Because Fifth Third did not have possession of receipts, Fifth Third's interest in those receipts was not perfected, resulting in the determination that those receipts did not constitute "cash collateral" subject to the provisions of 11 U.S.C. § 363(c)(2).

6. Any security interests of Fifth Third, whether or not perfected, did not attach to any receipts of miniature golf course patrons obtained by Wright on or after the date of the filing of the petition, pursuant to 11 U.S.C. § 552(a), and Wright is entitled to use those proceeds without recourse to 11 U.S.C. § 363(c)(2).

7. Because receipts obtained by Wright from miniature golf course patrons prior to the filing of the petition did not generate "proceeds" within the scope of 11 U.S.C. § 552(b), there is no "cash collateral" derived from proceeds with respect to the pre-petition receipts.

IT IS ORDERED, ADJUDGED AND DECREED as follows:

A. The determinations made by this order constitute a final judgment pursuant to Fed.R.Bankr.P. 9014(c)/Fed.R.Bankr.P. 7054/ Fed.R.Civ.P. 54(b): the court directs entry of a final judgment with respect to the matters addressed by this order, and expressly determines that there is no just reason for delay with respect to entry of that judgment.

B. The cash receipts derived by Wright from patrons of its miniature golf course facility to not constitute "cash collateral" as defined by 11 U.S.C. § 363(a), and Wright is free to use all such proceeds without consideration of 11 U.S.C. § 363(c)(2).