# UNITED STATES BANKRUPTCY APPELLATE PANEL

# OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. SC-11-1508-HPaJu |
| PREMIER GOLF PROPERTIES, LP, | Bk. No. 11-07388 |
|          Debtor. | |
| FAR EAST NATIONAL BANK, | |
|          Appellant, | |
| v. | OPINION |
| UNITED STATES TRUSTEE, SAN DIEGO; PREMIER GOLF PROPERTIES, LP, | |
|          Appellees. | |

Argued and Submitted on July 19, 2012
at Pasadena, California

Filed - August 13, 2012

Appeal from the United States Bankruptcy Court
for the Southern District of California

Honorable Peter W. Bowie, Bankruptcy Judge, Presiding

---

Appearances: Richard J. Frick of Frick Pickett & McDonald LLP, argued for the Appellant. Darvy Mack Cohan of the Law Offices of Darvy Mack Cohan argued for Appellee, Premier Golf Properties, LP.

---

Before: HOLLOWELL, PAPPAS, and JURY, Bankruptcy Judges.

HOLLOWELL, Bankruptcy Judge:

Far East National Bank (the Bank) filed a motion to prohibit the debtor from using cash collateral. The bankruptcy court denied the motion because it determined that revenue from the debtor's postpetition green fees and driving range fees did not constitute the Bank's cash collateral. The Bank appealed. For the reasons given below, we AFFIRM.

## I. FACTS

Premier Golf Properties, L.P. (the Golf Club) owns and operates the Cottonwood Golf Club in El Cajon, California. The Golf Club has two 18-hole golf courses, a driving range, pro shop, and club house restaurant. The Golf Club maintains the golf courses and operates a golf course business on the real property (Land). Its income comes from green fees, range fees, annual membership sales, golf lessons, golf cart rentals, pro shop clothing and equipment sales, and food and beverage services.

The Bank financed the Golf Club's business. In December 2007, the Bank loaned the Golf Club $11,500,000. The loan is secured by a Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing (Security Documents). According to the Security Documents, the Bank was granted a blanket security interest in all of the Golf Club's real and personal property. The Security Documents state, in part, that the Bank holds a security interest in all of the following described property "and all proceeds thereof":

> All accounts, contract rights, general intangibles, chattel paper, documents, instruments, inventory,

-2-

> goods, equipment . . ., including without limitation . . . all revenues, receipts, income, accounts, customer obligations, installment payment obligations . . . accounts receivable and other receivables, including without limitation license fees, golf club and membership initiation fees, green fees, driving range fees, golf cart fees, membership fees and dues, revenues, receipts, . . . and profits . . . arising from (i) rentals, . . license, concession, or other grant of right of possession, use or occupancy of all or any portion of the Land, and . . . (ii) the provision or sale of any goods and services . . . .

Additionally, the Security Documents included an Assignment of Rents and Leases assigning the Bank an interest in:

> all agreements affecting the use, enjoyment or occupancy of the Land now or hereafter entered into (the "Leases") and all rents, prepayments, security deposits, termination payments, royalties, profits, issues and revenues from the Land . . . accruing under the Leases . . . .

The Bank filed UCC-1 Financing Statements listing the same collateral as that in the Security Documents.

On May 2, 2011, the Golf Club filed a chapter 11 bankruptcy petition. It continued to operate its business as debtor in possession. The Golf Club opened a new bank account designated for cash collateral and segregated in that account its prepetition cash and receivables from goods and inventory sold, but did not segregate the revenue received from green fees and driving range fees.

On May 13, 2011, the Bank filed an emergency motion to prohibit the Golf Club from using cash collateral. The Bank asserted that the Golf Club was using the Bank's cash collateral in its ordinary course of business without the Bank's consent and without providing adequate protection.

On May 22, 2011, the Golf Club filed an opposition,

asserting that it was not using the Bank's cash collateral but was operating the estate from its own postpetition income. The Golf Club argued that the postpetition income from the sale of golf memberships, green fees, cart rentals, the sale of buckets of balls for the driving range, and food and beverage service was not the proceeds, profits, or products of the Bank's collateral.

In its reply, the Bank focused its argument on the revenue from the green fees and driving range fees. It argued the fees were cash collateral because they were rents derived from the use of the Land.[1] Alternatively, the Bank argued that if the green fees and driving range fees were not rents, they were still cash collateral because they were proceeds or profits of its personal property collateral.

A hearing was held June 2, 2011. The bankruptcy court took the matter under advisement. On September 1, 2011, the bankruptcy court entered a written decision and order denying the Bank's Motion to Prohibit Use of Cash Collateral. In re Premier Golf Props., L.P., 2011 WL 4352003 (Bankr. S.D. Cal. Sept. 1, 2011). The bankruptcy court held that the revenue received by the Golf Club for green fees and driving range fees was not the rents or proceeds of the Bank's security and therefore, was not cash collateral. The Bank timely appealed.

## II.  JURISDICTION

---

[1] Although the Bank focused on green fees and driving range fees, it stated that it did not waive its right to other postpetition income. However, the only issue for our review in this appeal is whether the Golf Club's green fees and driving range fees are cash collateral.

-4-

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(M).  We have jurisdiction under 28 U.S.C. § 158.

## III.  ISSUE

Did the bankruptcy court err in determining that postpetition revenue from the Golf Club's green fees and driving range fees was not rents, proceeds, or profits of the Bank's prepetition security, and therefore, did not constitute cash collateral?

## IV.  STANDARDS OF REVIEW

We review de novo whether the funds in question are cash collateral.  Zeeway Corp. v. Rio Salado Bank (In re Zeeway Corp.), 71 B.R. 210, 211 (9th Cir. BAP 1987).

## V.  DISCUSSION

### A.  Cash Collateral

A debtor in possession is prohibited from using cash collateral absent authorization by the court or consent from the entity that has an interest in the collateral.  11 U.S.C. § 363(c)(2).  Cash collateral consists of "cash, negotiable instruments . . . deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest."[2]  11 U.S.C. § 363(a).

---

[2] Section 363(a) provides that:
cash collateral means cash, negotiable instruments . . . deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the
(continued...)

-5-

As a general rule, postpetition revenue is not cash collateral. Under § 552(a), a creditor's prepetition security interest does not extend to property acquired by the debtor postpetition even if there is an "after acquired" clause in the security agreement.[3] 11 U.S.C. § 552(a). The purpose of § 552(a) is "to allow a debtor to gather into the estate as much money as possible to satisfy the claims of all creditors." Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.), 944 F.2d 500, 502 (9th Cir. 1991); Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.), 316 B.R. 330, 335 (9th Cir. BAP 2004).

Section 552(b) provides an exception to this rule. Section 552(b)(1) allows a prepetition security interest to extend to the postpetition "proceeds, products, offspring, or profits" of collateral to be covered by a security interest if the security agreement expressly provides for an interest in such property and the interest has been perfected under applicable nonbankruptcy

---

[2](...continued)
fees, . . . or other payments for the use or occupancy . . . lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

[3] Section 552:
(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

law.[4]  Additionally, § 552(b)(2) provides similar treatment for "amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties."[5]  Read together, the provisions of § 363(c)(2) and

---

[4] Section 552(b)(1):
Except as provided in sections 363, 506(c), 522, 544, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

[5] Section 552(b)(2):
Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

-7-

§ 552(b) protect a creditor's collateral from being used by a debtor postpetition if the creditor's security interest extends to one of the categories set out in § 552(b). Put another way, a creditor is not entitled to the protections of § 363(c)(2) unless its security interest satisfies § 552(b). Section 552(b) "balances the Code's interest in freeing the debtor of prepetition obligations with a secured creditor's rights to maintain a bargained-for interest in certain items of collateral." In re Bering Trader, Inc., 944 F.2d at 502. It provides "a narrow exception to the general rule of 552(a)." Id. (emphasis in original).

The Bank has the burden of establishing the existence and the extent of its interest in the property it claims as cash collateral. 11 U.S.C. § 363(p)(2); In re Las Vegas Monorail Co., 429 B.R. 317, 328 (Bankr. D. Nev. 2010). Thus, the Bank was required to show that (1) its security agreement extended to the Golf Club's postpetition revenue from green fees and driving range fees and (2) the green fees and driving range fees were proceeds, products, rents or profits of its prepetition collateral. In re Bering Trader, Inc., 944 F.2d at 501; In re Cafeteria Operators, L.P., 299 B.R. 400, 405 (Bankr. N.D. Tex. 2003).

**B.   Rents**

In 1987, the Ninth Circuit Bankruptcy Appellate Panel (BAP) articulated a general test for determining whether income from real property constitutes rents: If the income is produced by the real property, it is considered rents; but if the income is the result of services rendered or the result of the specific

business conducted on the property, then it does not constitute rents. In re Zeeway Corp., 71 B.R. at 211-12. In applying its test, the BAP concluded that gate receipts generated by postpetition races at the debtor's racetrack were not within the scope of rents subject to the creditor's deed of trust because the income was not produced by the occupancy or use of the real property, but by the services that the raceway provided.[6] Id.

Courts have applied the Zeeway test in deciding if a debtor's income from its business operations is rents within § 552(b). Prior to 1994, "rents" was included in the § 552(b)(1) exception and there was a long-running dispute in the courts about whether hotel revenues were rents. See, e.g., In re S.F. Drake Hotel Assocs., 131 B.R. 156, 159-60 (Bankr. N.D. Cal. 1991) aff'd, 147 B.R. 538 (N.D. Cal. 1992); Greyhound Real Estate Fin. Co. v. Official Unsecured Creditors' Comm. (In re Northview Corp.), 130 B.R. 543, 548 (9th Cir. BAP 1991). However, the addition of § 552(b)(2) resolved the dispute by treating hotel room revenue the same as rents. Nevertheless, courts continue to

---

[6] In dicta, the BAP considered that based on its test, income from the sale of crops, was not rents but the issues or profits derived from the utilization of the land. Zeeway, 71 B.R. at 211. It also observed that income generated by a restaurant or retail store, although produced in part by the use of the real property upon which business is conducted, was the result of the services provided by the business, and therefore, not rents. Id. Other applications of the Zeeway test include the BAP's holding that revenue received by a nursing home for care of patients was not rents because "[t]hat the patients live there is incidental to the fact that the nursing home is providing [the patients] with care." U.S. Dep't of Housing & Urban Dev. v. Hillside Assocs. (In re Hillside Assocs. Ltd. P'ship), 121 B.R. 23, 24 (9th Cir. BAP 1990).

-9-

confront the question of what constitutes rents in non-hotel cases and refer to pre-1994 case law analysis regarding whether a debtor's income was produced by the real property or by the services on the property.

Courts have used the Zeeway test to determine whether revenue from green fees and similar use fees is rents constituting cash collateral. The first of those decisions, In re GGVXX, Ltd., 130 B.R. 322, 326 (Bankr. D. Colo. 1991), held that revenue from green fees and use fees was not directly tied to or wholly dependent on the use of the real property, but was the result of the operation of the golf course business, and therefore, was not rents. The court determined that "a temporary right to enter upon real property and partake of the services offered thereon is not the same as an interest in real property." Id. Thus, it concluded that the relationship to the real property was "too attenuated from the actual real estate to reasonably be considered as directly derived from the use of the land." Id.

Similarly, the court in In re Everett Home Town Ltd. P'ship, 146 B.R. 453, 456 (Bankr. D. Ariz. 1992) held that although revenue from green fees was produced in part by the use of the real property, the income was the result of the services provided by the golf club business. However, it further held that revenue from suite fees was rents because, like a hotel room, the main charge was for the occupancy of the suite. Id. at 457.

The Bank asserts that the Ninth Circuit's opinion in Fin. Sec. Assurance, Inc. v. Days Cal. Riverside Ltd. P'ship (In re Days Cal. Riverside Ltd. P'ship), 27 F.3d 374 (9th Cir. 1994)

-10-

altered the Zeeway test. The Bank argues that Days created a new approach to determining whether income was rents by focusing on the economics of the case from the perspective of the source of the revenue and the bargain of the parties. Thus, the Bank argues that determining if revenue is rents must take into account the perspective of the lender, the contractual and economic intent of the parties at the time the loan was made, and the economic consequences on the financing market if § 552(b) is read too narrowly.

The Bank contends that revenue from the green fees and driving range fees is a primary component of the value of the Land. It argues that "[l]ike hotels, the value of golf courses, both for financing and investment purposes, is principally based on the net operating income of the golf course, a principal component of which is green fees and driving range fees." To give meaning to the benefit of the parties' agreement, the Bank asserts that the Golf Club's income from green fees and driving range fees must be considered rents generated from the Land.

The Bank's argument is unpersuasive. The Ninth Circuit in Days concluded that hotel room charges were rents based on its determination that under California law, room rent is "produced by the property." 27 F.3d at 377. Its conclusion was "buttressed by, although . . . not dependent upon, the distinction made in In re Bering Trader, Inc., 944 F.2d at 502, between income that is derivative from the secured property and income that is derived from services." Id. Thus, the Days court did not erode the Zeeway test in favor of a different approach. The Days court was mindful that hotel financing depended on

-11-

access to the stream of revenue produced by the hotels and that excluding hotel receipts from the scope of rents would cut against the bargain made by the parties. However, it based its decision on the premise that room rent was generated from the occupancy of real property and differentiated between revenue from occupancy of rooms and revenue that was generated by other services provided by the hotel. Id. Consequently, the Zeeway test remains a viable guideline for determining if revenue constitutes rents.

Moreover, to interpret Days as requiring the court to consider the parties' expectations regarding their bargained-for financing arrangement would erode § 552(a). Adopting the Bank's approach would mean that because the parties executed the Security Documents with the understanding that the Bank's security interest extended to green fees and driving range fees, such fees would also be covered postpetition. But as the bankruptcy court noted, the Bank's "approach would write the general rule of § 552(a) out of existence." In re Premier Golf Props., LP, 2011 WL 4352003 at *3 ("Congress was looking to protect the secured creditor's interest in its prepetition collateral, . . .[only] to the extent it was consumed, dissipated, transformed or transmuted.").

The bankruptcy court noted that the key to a golf club's generation of income is due to the regular planting, seeding, mowing, repositioning holes, watering, fertilizing, and maintaining the golf course. Based on Zeeway and Days, we agree with the bankruptcy court and conclude that the Golf Club's revenue from green fees and driving range fees is not produced

-12-

from the Land as much as generated by other services that are performed on the Land, and therefore, is not rents.

Unlike hotel cases where the revenue from room rental derives primarily from the usage of real property as shelter or occupancy, a golf course derives its revenue primarily from the usage of real property as entertainment. See, e.g., In re Everett Home Town Ltd. P'ship, 146 B.R. at 457 (hotel client mainly pays for the occupancy of the property); In re S.F. Drake Hotel Assocs., 131 B.R. at 161 (rent is "compensation for use of property . . . taken with the knowledge that a lodger primarily seeks shelter not service."). As a result, the bankruptcy court did not err in determining that the Golf Club's green fees and driving range fees were not rents subject to the Bank's real property security interest.

## C. Proceeds

The Bank alternatively argues that if the Golf Club's postpetition green fees and driving range fees are not rents, they are proceeds of the Bank's security interest in the Golf Club's intangible property.

As discussed above, distinguishing between after-acquired property and what may fall within § 552(b)'s exceptions is key to determining what is cash collateral. A creditor's interest in proceeds, products, offspring, or profits are secured "to the extent provided by . . . applicable nonbankruptcy law." Thus, Congress intended to defer to state law, namely, the Uniform Commercial Code (UCC), in making the determination of what

-13-

constitutes proceeds.[7] <u>In re Skagit Pac. Corp.</u>, 316 B.R. at 337 (stating that whether particular property constitutes proceeds is determined by state law and applying the UCC); <u>In re Las Vegas Monorail Co.</u>, 429 B.R. at 343 (same).

UCC § 9-102(a)(64) defines proceeds as:

> (A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
> (B) whatever is collected on, or distributed on account of, collateral;
> (C) rights arising out of collateral . . .

Accordingly, postpetition proceeds, products, offspring, or profits are subject to an after-acquired property clause only if they <u>derive from</u> prepetition collateral. <u>See</u> <u>In re Bering Trader, Inc.</u>, 944 F.2d at 502.

Here, the Bank holds a perfected security interest in general intangibles, including the Golf Club's personal property, licenses, payment obligations and receipts. A "general intangible" means:

> any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software.

---

[7] However, there is legislative history associated with § 552(b) that states "[t]he term 'proceeds' is not limited to the technical definition of that term in the UCC, but covers any property into which property subject to the security interest is converted." H.R. Rep. No. 95-595, 95 th Cong., 1 st Sess. 377 (1977). Notwithstanding the recognition that a broader definition of proceeds may be available, courts generally look to the UCC's definition of proceeds. <u>See</u> <u>In re Cafeteria Operators, LP</u>, 299 B.R. at 406 n. 2 (citations omitted).

-14-

UCC § 9-1-102(a)(42). "General intangibles" is a "residual" category of personal property, and includes rights that arise under a license and payment intangibles. See Official Comment 5(d). The question we must answer is whether the revenue from the Golf Club's green fees and driving range fees was acquired on the disposition of, or collected on, the Golf Club's general intangible property making them proceeds of the Bank's collateral.

a)    Licenses

A license is a contract that authorizes the use of an asset without an accompanying transfer of ownership. See Everex Sys. Inc., v. Cadtrak Corp. (In re CFLC, Inc.), 89 F.3d 673, 677 n.2 (9th Cir. 1996). There is no real dispute that the Golf Club licenses the use of the Land to golfers who pay for "a temporary right to enter upon real property and partake of the services offered thereon." In re GGVXX, Ltd., 130 B.R. at 326; In re The Wright Group, Inc., 443 B.R. 795, 800 (Bankr. N.D. Indiana 2011) (transaction between miniature golf operation and its customers consists of a license for access to real property). Thus, "[g]olfers, by paying a greens fee, become mere licensees, entitled to the non-exclusive use of the golf course for a short period of time." In re GGVXX, Ltd., 130 B.R. at 326.

The bankruptcy court addressed the Bank's argument that green fees and driving range fees were revenue from licenses to use the Land. However, the bankruptcy court concluded the UCC was inapplicable. We disagree. A license or access to golf premises is not an interest in real estate. Id.; In re The Wright Group, Inc., 443 B.R. at 800. Therefore, proceeds

-15-

received from a license are not subject to a security interest perfected under real property law. Instead, proceeds from a license are considered personal property. UCC § 9-1-102(a)(64); Sacramento Mansion, Ltd. v. Sacramento Sav. & Loan Ass'n (In re Sacramento Mansion, Ltd.), 117 B.R. 592, 607 (Bankr. D. Colo. 1990); In re GGVXX, Ltd., 130 B.R. at 326.

The Golf Club asserts that because the licenses belonged to the golfers, not the Golf Club, they were not part of the Bank's security interest. That argument is unpersuasive. The Golf Club, as licensor, collects payment in exchange for providing a license to golfers to use its facilities. It is akin to a software license, where a security interest covers the proceeds generated by the owner's grant of a license to the users of the software. A bank's security interest in the software company's licenses would extend to the payments generated by the sale of the licenses to customers.

However, the BAP has noted that "revenue generated by the operation of a debtor's business, post-petition, is not considered proceeds if such revenue represents compensation for goods and services rendered by the debtor in its everyday business performance . . . . Revenue generated post-petition solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest." In re Skagit Pac. Corp., 316 B.R. at 336. Section 552(b) is "intended to cover after-acquired property that is directly attributable to prepetition collateral, without addition of estate resources." Alan N. Resnick & Henry J. Sommer eds., COLLIER ON BANKRUPTCY, ¶ 552.02[2] (16th ed. 2012) (emphasis added); see also, In re Northview Corp., 130 B.R. at

-16-

548 (proceeds, profits and rents are the result of collateral's conversion into new forms without the aid of new services or assets).

The Golf Club must maintain the Land regularly as part of its business operation by mowing, planting, watering, fertilizing, and repairing the grass, raking sand traps, re-positioning the holes, and retrieving golf balls from the range. Thus, the revenue that the Golf Club generates postpetition on the licenses is not merely from issuing a license to its customers but is largely the result of the Golf Club's labor and own operational resources, which make the license valuable to golfers. See, e.g., In re S & J Holding Corp., 42 B.R. 249, 250 (Bankr. S.D. Fla. 1984) (cash revenue from debtor's video and vending machines was not proceeds of security interest in intangible assets because the cash was received from the use of the collateral rather than its sale). Consequently, although the green fees and driving range fees may be "collected on" the Golf Club's licenses, they are not proceeds generated from the Bank's collateral.

b)   Payment Intangibles

We next determine whether the revenue from the Golf Club's green fees and driving range fees constitute proceeds of the Bank's security interests in other general intangible property. Although case law on this issue is sparse, we do have the benefit of an Indiana bankruptcy court's analysis of whether income derived from a debtor's operation of a miniature golf course facility constituted proceeds of the creditor's security interest in intangible property. In re The Wright Group, Inc., 443 B.R.

-17-

at 802-03. There, the court determined that the transaction between the debtor and its customers was a simultaneous transaction by which the debtor granted a license for use of the course at the same time that the customer paid the fee for the license. Because there was no debt or monetary obligation created, there was no account[8] or payment intangible,[9] and consequently, no proceeds of the collateral was generated. Id. at 801-02.

Instead, the court determined that the postpetition revenue from the miniature golf customers constituted "money," which did not fall under the definition of a general intangible and could only be perfected by possession. Id. at 805-06; See also In re S & J Holding Corp., 42 B.R. at 250 (cash from video game machines). The court determined that since "implicit in the concept of 'cash collateral' is that a creditor has an enforceable security interest," the receipts did not constitute cash collateral because the creditor did not have possession of the cash receipts paid by the customers. Id. at 805.

The reasoning of the court in In re The Wright Group, Inc., is sound: the payment of green fees and driving range fees by golfers to use the golf course is a simultaneous transaction that does not produce a monetary obligation. As a result, the revenue

---

[8] An "account" is a "right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of, . . . ." UCC § 9-102(a)(2).

[9] A "payment intangible" means "a general intangible under which the account debtor's principal obligation is a monetary obligation." UCC § 9-102(a)(61).

-18-

is not derived from a creditor's security interest in general intangibles. Therefore, we conclude that the green fees and driving range fees are not proceeds of the Bank's security interest and do not constitute the Bank's cash collateral.

**D.   Profits**

In <u>In re Northview Corp.</u>, 130 B.R. at 548, the BAP noted that the term "profits" in § 552(b) refers to the sale of real property to which a perfected security interest attached. Thus, profits arise out of the ownership of real property and derive from conversion of the property into some other property. <u>Id.</u> We already concluded that the green fees and driving range fees are not derivative of the Bank's security interest in the Land when we determined that the fees were not in the nature of rents. As a result, the green fees and driving range fees are not profits of the Bank's security interest in the Land.

**VI. CONCLUSION**

The postpetition revenue from the Golf Club's green fees and driving range fees is not the rents, proceeds or profits of the Bank's security interest within the exceptions of § 552(b). Accordingly, we conclude that the green fees and driving range fees are not the Bank's cash collateral. Therefore, we AFFIRM.